**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| In re KKR FINANCIAL HOLDINGS LLC SHAREHOLDER LITIGATION | Consol. C.A. No. 9210-CB |

**OPINION**

Date Submitted:  July 29, 2014
Date Decided:  October 14, 2014

Stuart M. Grant, Mary S. Thomas, Nathan A. Cook and Bernard C. Devieux of Grant & Eisenhofer P.A., Wilmington, Delaware; Mark Lebovitch, Jeroen van Kwawegen and Adam Hollander of Bernstein Litowitz Berger & Grossmann LLP, New York, New York; Christine S. Azar, Peter C. Wood, Jr. and Ned C. Weinberger of Labaton Sucharow LLP, Wilmington, Delaware; Christopher J. Keller, Eric J. Belfi and Michael W. Stocker of Labaton Sucharow LLP, New York, New York, Co-Lead Counsel for Plaintiffs.

Gregory P. Williams, Blake Rohrbacher and Susan M. Hannigan of Richards, Layton & Finger, P.A. of Wilmington, Delaware; Paul C. Curnin, Peter E. Kazanoff and Janet A. Gochman of Simpson Thacher & Bartlett LLP, New York, New York, Attorneys for Defendants KKR & Co. L.P., KKR Fund Holdings L.P., and Copal Merger Sub LLC.

Collins J. Seitz, Jr., Garrett B. Moritz and Eric D. Selden of Seitz Ross Aronstam & Moritz LLP, Wilmington, Delaware; William Savitt, Ryan A. McLeod and David Zhou of Wachtell, Lipton, Rosen & Katz, New York, New York, Attorneys for Defendants Tracy Collins, Robert L. Edwards, Craig J. Farr, Vincent Paul Finigan, Jr., Paul M. Hazen, R. Glenn Hubbard, Ross J. Kari, Ely L. Licht, Deborah H. McAneny, Scott C. Nuttall, Scott Ryles, Willy Strothotte, and KKR Financial Holdings LLC.

**BOUCHARD, C.**

## I. INTRODUCTION

This action involves the novel claim that a holder of less than one percent of the stock of a Delaware corporation was a controlling stockholder and thus owed fiduciary obligations to the other stockholders of the corporation.

In April 2004, KKR & Co. L.P. ("KKR") acquired KKR Financial Holdings LLC ("KFN") in a stock-for-stock merger involving two widely-held, publicly-traded companies. Seeking to overcome the presumption that business judgment review would apply to such a transaction, plaintiffs argue that entire fairness should apply because KKR was a controlling stockholder of KFN despite its less than one percent ownership and because a majority of the twelve members of the KFN board that approved the merger was beholden to and not independent from KKR.

Plaintiffs' controlling stockholder theory is based on the terms of a management agreement whereby an affiliate of KKR managed the day-to-day business of KFN, making KFN operationally dependent on KKR. Since KFN's inception, however, the ultimate authority for managing its business and affairs, including the decision whether to approve a merger with KKR, was in the hands of a board of directors subject to annual stockholder election.

In this opinion, I conclude that, although the allegations of the complaint demonstrate that KKR's affiliate managed the day-to-day operations of KFN, they do not support a reasonable inference that KKR controlled the board of KFN when it approved the merger, which is the operative question under Delaware law for determining whether a stockholder is controlling in this case. For this reason, I dismiss plaintiffs' fiduciary

1

duty claim against KKR premised on the theory that KKR was a controlling stockholder of KFN.

I also conclude that plaintiffs' fiduciary duty claim against the directors of KFN fails to state a claim for relief because the board's approval of the merger is subject to business judgment review for two independent reasons. First, plaintiffs have failed to allege facts from which it is reasonably inferable that a majority of the KFN board was not disinterested in the transaction or independent from KKR. Second, even if plaintiffs had alleged sufficient facts to reasonably support such an inference, business judgment review still would apply because the merger was approved by a majority of disinterested stockholders in a fully-informed vote.

For these reasons, and others stated below, this action is dismissed with prejudice under Rule 12(b)(6) for failure to state a claim for relief.

## II.    BACKGROUND[1]

### A.    The Parties

Plaintiffs Pompano Beach Police & Firefighters' Retirement System, Robert A. Corwin, Eric Greene, Margaret DeMauro and Pipefitters Local Union No. 120 Pension Fund were stockholders of KFN who owned shares of KFN at all times relevant to this action.

---

[1] Unless otherwise noted, the facts recited in this Opinion are based on the allegations in the complaint, documents integral to or incorporated in the complaint, or facts of which the Court may take judicial notice.

2

Defendant KKR, a Delaware limited liability partnership, is a private equity firm based in New York that specializes in leveraged buyouts. The company was founded in 1976. Today it is a multinational investment firm. KKR completed an initial public offering on July 15, 2010, and its common stock trades under the ticker symbol "KKR" on the New York Stock Exchange.

Defendant KFN, a Delaware limited liability company, was a specialty finance company whose business was generating income and capital appreciation, primarily through investing in sub-investment grade corporate debt securities.

Defendants Tracy Collins, Robert L. Edwards, Craig J. Farr, Vincent Paul Finigan, Jr., Paul M. Hazen, R. Glenn Hubbard, Ross J. Kari, Ely L. Licht, Deborah H. McAneny, Scott C. Nuttall, Scott Ryles, and Willy Strothotte (together, the "KFN board") were the twelve members of the KFN board of directors in December 2013, when the decision was made to merge with KKR.

Defendants KKR Fund Holdings L.P., an exempted limited partnership formed under the laws of the Cayman Islands ("Holdings"), and Copal Merger Sub LLC, a Delaware limited liability company ("Copal"), are wholly owned subsidiaries of KKR. They were parties to the merger agreement along with KKR and KFN.

## B.    The Formation of KKR Financial

In 2004, KKR formed KKR Financial Corp., a Maryland real estate investment trust ("KKR Financial"). In June 2005, KKR Financial engaged in an initial public offering. The prospectus for that offering described KKR Financial as "a specialty

3

finance company created to invest across multiple asset classes with the objective of achieving attractive leveraged risk-adjusted returns."[2]

The 2005 prospectus disclosed that KKR Financial would be "externally managed and advised by KKR Financial Advisors LLC, an affiliate of KKR, pursuant to a management agreement."[3] The prospectus describes the management agreement in detail.[4] The terms of the management agreement, as amended following the restructuring of KKR Financial into KFN, are described below.

### C.     The Restructuring of KKR Financial into KFN

In April 2007, KKR Financial announced a proposed restructuring whereby KKR Financial would be reincorporated as a subsidiary of KFN, a newly created entity. The transaction was subject to the approval of the stockholders of KKR Financial. The prospectus for the transaction (the "2007 Prospectus") disclosed that KFN would "assume all obligations of KKR Financial Corp. under the management agreement," which would be amended and restated (hereafter, the "Management Agreement"), and that the "economic terms of the amended and restated management agreement will not be

---

[2] KKR Fin. Corp., Prospectus (Form B4) 1 (June 24, 2005) (KFN Defs.' Op. Br. Ex. 1 at 1). Although this document is not referenced in the complaint, I take judicial notice of its text, which cannot reasonably be disputed. *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *5 (Del. Ch. Dec. 22, 2010) ("For example, a court may take judicial notice of the contents of an SEC filing, but only to the extent that the facts contained in them are not subject to reasonable dispute.").

[3] *Id.* at 6.

[4] *Id.* at 6-8, 20-22, 101-03, 115-25.

changed."[5]  KKR Financial's stockholders approved the restructuring, which became effective in May 2007.

### D.  The Management Agreement

Under the terms of the Management Agreement, KFN delegated responsibility for its day-to-day operations to KKR Financial Advisors LLC ("KFA" or the "Manager"), the same affiliate of KKR that had served as the manager of KFN's predecessor:

> (b) . . . The Manager will be responsible for the day-to-day operations of the Company and will perform (or cause to be performed) such services and activities relating to the assets and operations of the Company as may be appropriate, including, without limitation: . . .
>
> *  *  *
>
> (vii) providing executive and administrative personnel, office space and office services required in rendering services to the Company;
> (viii) administering the day-to-day operations of the Company and performing and supervising the performance of such other administrative functions necessary in the management of the Company as may be agreed upon by the Manager and the Board of Directors . . . .[6]

Plaintiffs' complaint quotes public filings of KFN describing its dependence on KFA as a result of the Management Agreement:

---

[5] KKR Fin. Corp., Prospectus (Form B4) 2 (Apr. 2, 2007) (KFN Defs.' Op. Br. Ex. 2 at 2).  I take judicial notice of the text of this document, which cannot reasonably be disputed.  *See Narrowstep, Inc.*, 2010 WL 5422405, at *5.

[6] Management Agreement § 2(b)(vii)-(viii) (KFN Defs.' Op. Br. Ex. 4 § 2(b)(vii)-(viii)).  The complaint discusses the Management Agreement at length.  *See* Compl. ¶¶ 45-49.  Thus, I view the Management Agreement to be integral to the complaint and appropriate to consider in its entirety on a motion to dismiss.  *In re New Valley Corp. Deriv. Litig.*, 2001 WL 50212, at *4 (Del. Ch. Jan. 11, 2001) ("The Court may … 'consider, for certain purposes, the content of documents that are integral to or are incorporated by reference into the complaint.'") (citation omitted).

5

*We are highly dependent on our Manager and may not find a suitable replacement if our Manager terminates the Management Agreement.*

We have no employees **. . .** *We have no separate facilities and are completely reliant on our Manager, which has significant discretion as to the implementation and execution of our business and investment strategies and our risk management practices*.[7]

Similar disclosures were made in the 2007 Prospectus, when KFN was created to replace KKR Financial.[8]

According to plaintiffs, the Management Agreement made KFA responsible for, among other things, "(i) selecting, purchasing and selling KFN's investments; (ii) KFN's financing and risk management; and (iii) providing investment advisory services to KFN."[9] Plaintiffs also allege that KFN was reliant on KKR to value its assets.

KFN's primary asset was a portfolio of subordinated notes in collateralized loan transactions that financed the leveraged buyout activities of KKR. The vast majority of KFN's holdings and liabilities were "Level 2" and "Level 3" assets, meaning that there were no observable market prices for those holdings and liabilities. KFN valued those assets and liabilities by applying a valuation model, which relied on inputs, estimations and judgments that KKR supplied and controlled.

---

[7] Compl. ¶ 45 (quoting KKR Fin. Hldg. LLC, Annual Report (Form 10-K) 43-44 (Feb. 28, 2013).

[8] *See* 2007 Prospectus at 23 ("We have no employees. … We have no separate facilities and are completely reliant on our Manager, which has significant discretion as to the implementation and execution of our business and investment strategies and our risk management practices. We are also subject to the risk that our Manager will terminate the management agreement and that no suitable replacement will be found.").

[9] Compl. ¶ 46.

6

In exchange for the services they provided, KKR and its affiliates were entitled to receive from KFN a base management fee equal to one-twelfth of KFN's equity multiplied by 1.75%, certain incentive compensation based on a complex formula and reimbursement of certain expenses. These fees (without expenses) equated to $60.5 million and $65.8 million, respectively in 2011 and 2012.

The Management Agreement renewed automatically each year by its own terms. KFN and its stockholders could terminate the Management Agreement under certain circumstances. According to plaintiffs, "they can do so only under certain conditions, generally with nearly six months advance notice, and with a Termination Fee of four times the sum of the average annual base management and incentive fee for the two years preceding termination."[10] Plaintiffs allege that, if the Management Agreement was terminated without cause on December 31, 2012, KFN would have been required to pay KKR approximately $252.6 million, which exceeded the amount of cash and cash equivalents on its balance sheet at that time (approximately $221.9 million).

Notwithstanding KFN's reliance on KFA to manage KFN's day-to-day operations, the Management Agreement explicitly provided that KFA would be subject to the supervision of KFN's board of directors:

> The Manager, in its capacity as manager of the assets and the day-to-day
> operations of the Company, at all times will be subject to the supervision of
> the Company's Board of Directors and will have only such functions and

---

[10] Compl. ¶ 48. The payment of the Termination Fee referenced in the complaint is triggered under Section 15(a) of the Management Agreement. Section 13(a) of the Management Agreement further provides that the Manager may be terminated "for cause" under certain circumstances without paying the Termination Fee.

authority as the Company may delegate to it including, without limitation, the functions and authority identified herein and delegated to the Manager hereby.[11]

More broadly, the Amended and Restated Operating Agreement of KFN (the "LLC Agreement"), the original version of which was disclosed publicly as part of the 2007 Prospectus, empowers KFN's board of directors using language similar to Section 141(a) of the Delaware General Corporation Law. It provides that, except as otherwise provided in the LLC Agreement, "the business and affairs of [KFN] shall be managed by or under the direction of its Board of Directors."[12]

### E.     The Merger Negotiations

In October 2013, KKR expressed an interest in acquiring KFN to Hazen, one of KFN's directors. At this time, and at all times relevant to this action, KKR owned less than 1% of the shares of KFN.[13]

---

[11] Management Agreement § 2(b) (KFN Defs.' Op. Br. Ex. 4 § 2(b)).

[12] Amended and Restated Operating Agreement of KKR Fin. Hldg. LLC § 6.2 (KFN Defs.' Op. Br. Ex. 5 § 6.2) (hereafter, the "LLC Agreement"). As discussed above, I take judicial notice of the text of the 2007 Prospectus because it cannot reasonably be disputed. Section 6.3 of the LLC Agreement provides for the elimination of fiduciary duty claims against KFN's directors to the fullest extent permitted by law if they act in accordance with the Management Agreement.

[13] Citing KKR's Form 10-K filed on February 22, 2013, plaintiffs allege that, as of December 31, 2012, KKR owned 0.1% of KFN's outstanding shares and would own 0.35% if it exercised all of its vested options to buy KFN shares. Compl. ¶ 44. This is the only allegation in the complaint concerning KKR's ownership position in KFN. In briefing the motion to dismiss, all parties assumed that this was the level of KKR's ownership position at all relevant times. KKR's Form 10-K filed on February 24, 2014, states that, if KKR were to exercise all of its outstanding vested options, its ownership interest in KFN would be less than 1% of KFN's outstanding shares as of December 31, 2013. KKR & Co. L.P., Annual Report (Form 10-K) 234 (Feb. 24, 2014). Consistent

8

On October 22, 2013, Hazen raised KKR's interest in acquiring KFN at a KFN board meeting. During the meeting, the KFN board granted KKR permission to use confidential information about KFN it had obtained through KFA's service as Manager in order to make an acquisition proposal.

After the October 22 board meeting, Hazen asked Farr, a senior executive of KKR who was serving as the President, CEO and a director of KFN, whether KKR would consider modifying or eliminating the Termination Fee in the Management Agreement. Farr contacted KKR and was informed that KKR was unwilling to do so.

On October 31, 2013, KFN formed a Transaction Committee (the "Transaction Committee") to consider a potential transaction.[14] The Transaction Committee consisted of six of the twelve directors on the KFN board: Edwards, Collins, Finigan, Kari, McAneny, and Ryles. Edwards was named Chair of the Transaction Committee. The Transaction Committee retained Sandler O'Neill + Partners L.P. as its financial advisor and Wachtell, Lipton, Rosen & Katz as its legal advisor.

On November 21, 2013, Hazen attended a meeting of the Transaction Committee to update its members on KFN's prospects as a stand-alone company. Plaintiffs allege

---

with the foregoing, and for simplicity, I refer to KKR's ownership position in KFN as being less than 1%.

[14] Compl. ¶ 86. Plaintiffs' complaint omits the publicly-disclosed fact that KKR submitted a proposal to acquire KFN in an all stock transaction the day before, on October 30, which was conditioned on the approvals of an independent KFN board committee and a majority of KFN common stockholders unaffiliated with KKR. KKR Fin. Corp., Definitive Proxy Statement (Schedule 14A) 31 (Mar. 25, 2014) (KFN Defs.' Op. Br. Ex. 9 at 31) (hereafter, the "2014 Proxy").

that the Transaction Committee recognized that an all-stock deal could be disadvantageous to KFN because its shares were trading near their one-year low while KKR's units were trading near their one-year high. The Transaction Committee proposed a cash deal to KKR, but KKR rejected it. The Transaction Committee negotiated for improvements to KKR's proposal, which plaintiffs allege were "meager."[15]

On December 9, 2013, Hubbard, KFN's Lead Independent Director, met with KKR co-heads and founders Henry Kravis and George Roberts for the purpose of attempting to negotiate a higher price for KFN's stockholders. At the meeting, Kravis and Roberts refused to increase the merger consideration above 0.50 KKR units for each KFN share.[16]

The next day, on December 10, 2013, Kravis and Roberts met with the KFN board. After the meeting, KKR revised its offer to a "best and final offer" of 0.51 KKR units per KFN share.[17] At the request of Edwards, Chair of the Transaction Committee, Hazen contacted KKR and asked for consideration of 0.52 KKR shares per KFN share. KKR rejected this request.

---

[15] Compl. ¶ 88.

[16] Compl. ¶ 89. Plaintiffs' complaint omits any reference to a series of interim discussions and the Transaction Committee's previous rejection of proposals involving lower exchange ratios (0.46 and 0.48) that are described in the 2014 Proxy. 2014 Proxy at 31-33 (KFN Defs.' Op. Br. Ex. 9 at 31-33).

[17] Compl. ¶ 90.

On December 13, 2013, the KFN board, excluding Farr and Nuttall, met to discuss the proposed transaction. The Transaction Committee then met and voted to recommend the proposed transaction to the KFN board. The full KFN board, again excluding Farr and Nuttall, reconvened and approved the transaction. Sandler O'Neill delivered a fairness opinion to the Transaction Committee concluding that, as of December 16, 2013, the exchange ratio was fair, from a financial point of view, to KFN's stockholders.

On December 16, 2013, KKR and KFN executed the merger agreement. At an exchange ratio of 0.51 KKR units per KFN share, the transaction reflected a 35% premium to KFN's closing price on that day. Based on KKR's common unit price on December 16, 2013, the transaction was valued at approximately $2.6 billion.

### F.      The Merger Agreement and Stockholder Approval

The merger agreement contained several deal protection provisions: (1) a termination fee of $26.25 million, representing approximately 1% of the estimated $2.6 billion value of the transaction when the merger agreement was signed, (2) a no-shop provision barring KFN from soliciting or negotiating alternative proposals with third-parties, subject to a "fiduciary out" if a third party made an unsolicited bid for at least 15% of KFN that could reasonably be expected to lead to a competing bid, and (3) a "matching rights" provision requiring KFN to submit any alternative proposal to KKR within one day and giving KKR four business days to match or better the alternative proposal before KFN can engage with the competing bidder.

The merger was subject to the approval of holders of a majority of KFN's common shares. The merger agreement required that the requisite majority include a

majority of shares held by persons other than KKR and its affiliates.[18] The merger agreement's definition of "affiliate" excludes investment funds, other investment advisory vehicles, and portfolio companies of investment funds.[19]

On March 24, 2014, a definitive proxy statement was issued soliciting KFN's stockholder to approve the proposed merger (the "2014 Proxy"). On April 30, 2014, KFN's stockholders voted in favor of the proposed merger, including a majority of the outstanding KFN common shares entitled to vote on the merger held by common stockholders other than KKR and its affiliates.[20]

## G. Procedural History

On December 27, 2013, the first of nine actions were filed in this Court challenging the proposed merger. These actions were consolidated on January 31, 2014.

---

[18] Compl. ¶ 98.

[19] Compl. ¶ 99.

[20] In their answering brief, plaintiffs state that "[o]n April 30, 2014, KFN filed a Schedule 13E-3 with the U.S. Securities and Exchange Commission announcing that a majority of the outstanding KFN common shares entitled to vote at a special meeting held that day had approved the Merger Agreement." Pls.' Ans. Br. 16. The cited Schedule 13E-3 more fully states as follows: "On April 30, 2014, at a special meeting of KFN's common shareholders, the holders of a majority of the outstanding KFN common shares entitled to vote on the adoption of the Merger Agreement, including a majority of the outstanding KFN common shares entitled to vote on the Merger Agreement held by common shareholders other than KKR and its affiliates, affirmatively voted to adopt the Merger Agreement." KKR Fin. Hldg. LLC, Amended Going Private (Schedule 13E-3) 3 (Apr. 30, 2014). I take judicial notice of the result of the transaction, which is not disputed. *See In re General Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170-71 (Del. 2006) (holding that Court of Chancery did not err when it took judicial notice of stockholder vote approving transactions where there existed no reasonable dispute as to whether stockholder approval had occurred).

On February 21, 2014, plaintiffs filed a Verified Consolidated Class Action Complaint (referred to herein as the "complaint") asserting three claims for relief. Count I asserts that the members of the KFN board breached their fiduciary duties of due care and loyalty by agreeing to the merger. Count II asserts that KKR breached its fiduciary duty of loyalty in its capacity as a controlling stockholder of KFN by causing KFN to enter into the merger agreement at an unfair price and following an unfair process. Count III asserts that KKR, Holdings and Copal (KFN's counterparties to the merger agreement) aided and abetted the KFN board's breach of fiduciary duty.

On March 7, 2014, defendants moved to dismiss the complaint in its entirety under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Plaintiffs made no effort to challenge the sufficiency or accuracy of the disclosures in the 2014 Proxy before the meeting of KFN's stockholders was held on April 30, 2014, or to seek to enjoin the closing of the transaction on any other basis.

## III.  LEGAL ANALYSIS

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."[21] Enhanced judicial scrutiny under *Revlon* is not implicated in this action because the stock-for-stock merger involved widely-held, publicly traded companies.[22] Thus, the business judgment rule presumptively applies.

---

[21] *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984) (citing 8 *Del C.* § 141(a)).

[22] *See Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1290 (Del. 1994) ("[T]here is no 'sale or change in control' when '[c]ontrol of both [companies] remain[s] in a large,

Under the business judgment rule, "the judgment of a properly functioning board will not be second-guessed and '[a]bsent an abuse of discretion, that judgment will be respected by the courts.'"[23] "To avoid application of the deferential business judgment standard, the plaintiff must produce evidence that rebuts the business judgment presumption."[24]

There are a number of ways a plaintiff can rebut the business judgment presumption, including by showing that: (1) a controlling stockholder stands on both sides of a transaction[25] or (2) at least half of the directors who approved the transaction were not disinterested or independent.[26] "If the plaintiff rebuts the business judgment presumption, the Court applies the entire fairness standard of review to the challenged action and places the burden on the directors to prove that the action was entirely fair."[27]

If the plaintiff is able to rebut the business judgment presumption, dismissal at this stage of the litigation would, in all likelihood, be inappropriate.[28] If, however, plaintiffs

---

fluid, changeable and changing market.'") (quoting *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 47 (Del. 1994)).

[23] *Orman v. Cullman*, 794 A.2d 5, 20 (Del. Ch. 2002) (quoting *Aronson*, 473 A.2d at 812).

[24] *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 36 (Del. Ch. 2010).

[25] *See Williamson v. Cox Commc'ns Inc.*, 2006 WL 1586375, at *4 (Del. Ch. June 5, 2006).

[26] *See Aronson*, 473 A.2d at 812.

[27] *eBay Domestic Holdings, Inc.*, 16 A.3d at 36-37.

[28] *See Hamilton P'rs, L.P. v. Highland Capital Mgmt., L.P.*, 2014 WL 1813340, at *12 (Del. Ch. May 7, 2014) ("[T]he possibility that the entire fairness standard of review may

are unable to rebut the business judgment presumption, they "will not be entitled to any remedy unless the challenged transaction constitutes waste."[29] Having not alleged waste, plaintiffs' complaint here will be dismissed if they fail to rebut the business judgment presumption.

Plaintiffs argue that entire fairness review of the transaction is implicated, thereby precluding dismissal at this stage of the litigation. As to Count II, which is based on KKR's alleged breach of fiduciary duty, plaintiffs contend that KKR was a controlling stockholder of KFN. As to Counts I and III, which are based on the KFN board's alleged breaches of fiduciary duty, plaintiffs argue that entire fairness review is appropriate because the majority of the KFN board was not disinterested and independent.

For their part, defendants argue that business judgment review is appropriate, and requires dismissal of all claims, because KKR was not a controlling stockholder of KFN and because the majority of the KFN board that approved the transaction was independent and disinterested. Defendants also contend that, even if the majority of the board was not independent and disinterested, the business judgment rule still applies because the transaction was approved by a fully informed majority of disinterested stockholders of KFN.

---

apply tends to preclude the Court from granting a motion to dismiss under Rule 12(b)(6) unless the alleged controlling stockholder is able to show, conclusively, that the challenged transaction was entirely fair based solely on the allegations of the complaint and the documents integral to it.").

[29] *Zutrau v. Jansing*, 2014 WL 3772859, at *17 (Del. Ch. July 31, 2014).

For the reasons explained below, I conclude that it is not reasonably inferable from the complaint that KKR was a controlling stockholder of KFN or that a majority of the KFN board was not disinterested or independent. I also conclude that, even if the majority of the KFN board was not disinterested or independent, business judgment review still applies because the merger was approved by a majority of disinterested KFN stockholders in a fully informed vote. Thus, all three claims in the complaint will be dismissed for failure to state a claim upon which relief can be granted.

## A. Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim must be denied "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances."[30] "In determining whether a pleading meets this minimal standard, this Court draws all reasonable inferences in the plaintiff's favor, accepts all well-pleaded factual allegations as true, and even accepts 'vague allegations in the Complaint as 'well pleaded' if they provide the defendant notice of the claim.'"[31]

## B. The Complaint Fails to State a Claim that KKR was a Controlling Stockholder of KFN

Plaintiffs argue that "the entire fairness standard applies to the [merger] because KKR controls KFN."[32] Relatedly, plaintiffs allege in Count II that KKR breached its

---

[30] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011); *see also Winshall v. Viacom Int'l., Inc.*, 76 A.3d 808, 813 n.12 (Del. 2013).

[31] *Seinfeld v. Slager*, 2012 WL 2501105, at *2 (Del. Ch. June 29, 2012) (quoting *Cent. Mortg. Co.*, 27 A.3d at 536).

[32] Compl. ¶ 149.

16

fiduciary duty of loyalty in its capacity as a controlling stockholder of KFN because "KKR, which through certain of its affiliates is a stockholder of KFN, dominates and controls KFN by virtue of the Management Agreement through which it provides all of KFN's management and operations."[33]

In 1994, in the seminal case of *Kahn v. Lynch Communications Systems, Inc.* ("*Lynch*"), the Delaware Supreme Court described two scenarios in which a stockholder could be found a controller under Delaware law: where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but "*exercises control* over the business affairs of the corporation."[34] This case concerns the second scenario because KKR owned less than 1% of the KFN common shares when the KFN board approved the merger. To survive a motion to dismiss under this theory, plaintiffs must allege facts demonstrating "actual control with regard to the particular transaction that is being challenged."[35]

In 2003, in what has been recognized as perhaps this Court's "most aggressive finding that a minority blockholder was a controlling stockholder,"[36] then-Vice Chancellor Strine found after trial in *In re Cysive, Inc. Shareholders Litigation*,[37] that a

---

[33] Compl. ¶ 157.

[34] *Kahn v. Lynch Commc'ns Sys., Inc.*, 638 A.2d 1110, 1113-14 (Del. 1994) (quoting *Ivanhoe P'rs v. Newmont Mining Corp.*, 535 A.2d 1334, 1344 (Del. 1987)).

[35] *Cox Commc'ns Inc.*, 2006 WL 1586375, at *4.

[36] *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013).

[37] 836 A.2d 531 (Del. Ch. 2003).

35% stockholder (Nelson Carbonell) who was the company's visionary founder and a "hands-on" Chairman and CEO, was a controlling stockholder. The Court concluded that, "[i]n practical terms, Carbonell holds a large enough block of stock to be the dominant force in any contested [Company] election," especially when the votes of "a unified voting coalition" consisting of his subordinate and family members are taken into account along with the fact that "a 100% turn-out is unlikely even in a contested contest."[38]

Three years later, again focusing on the second scenario identified in *Lynch*, then-Vice Chancellor Strine stated in *In re PNB Holding Co. Shareholders Litigation*, that the "actual control" test "is not easy to satisfy," and can only be met where "stockholders who, although lacking a clear majority, have such formidable voting and managerial power that they, as a practical matter, are no differently situated than if they had majority voting control."[39] The Court explained that the *Lynch* line of jurisprudence "has been premised on the notion that when a controller wants the rest of the shares, the controller's power is so potent that independent directors and minority stockholders cannot freely exercise their judgment, fearing retribution from the controller."[40]

One week after *PNB Holding* was decided, this Court considered the second scenario identified in *Lynch* in the context of a motion to dismiss. In *Superior Vision*

---

[38] *Id*. at 551-52, 552 n.30.

[39] *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

[40] *Id*.

18

*Services, Inc. v. ReliaStar Life Insurance Co.,*[41] plaintiff argued that a 44% stockholder of

ReliaStar owed fiduciary obligations as a controlling stockholder regarding the

company's payment of dividends because the stockholder had a contractual right that

effectively enabled it to veto any dividend payments. In performing its analysis, the

Court asked "whether the actual control must be over the Board or whether separately

negotiated contract rights can supply the requisite degree of control."[42] Based on its

examination of *Lynch* and subsequent cases,[43] the Court concluded that "Delaware case

law has focused on control of the board:"

> [T]he focus of the inquiry has been on the *de facto* power of a significant
> (but less than majority) shareholder, which, when coupled with other
> factors, gives that shareholder the ability **to dominate the corporate
> decision-making process**. The concern is that the significant shareholder
> will use its power to obtain (or compel) favorable actions **by the board** to
> the ultimate detriment of other shareholders.[44]

The Court granted the motion to dismiss finding that the allegation that ReliaStar had

"taken advantage of its contractual rights for its own purposes" was, without more, "not

---

[41] 2006 WL 2521426 (Del. Ch. Aug. 25, 2006) (granting motion to dismiss).

[42] *Id*. at *4.

[43] In addition to *Lynch*, the Court examined *Cox Commc'ns, Inc.*, 2006 WL 1586375 (denying defendants' motion to dismiss because the allegations in the complaint supported a reasonable inference that a stockholder group (Cox and Comcast) with combined holdings of 17.1% of At Home common stock was controlling where "Cox and Comcast had the ability to shut down the effective operation of the At Home board of directors by vetoing board actions"); and *In re Western Nat. Corp. S'holders Litig.*, 2000 WL 710192 (Del. Ch. May 22, 2000) (46% stockholder with ability to purchase an additional 20% during any twelve month period was not controlling because plaintiffs did not establish that the stockholder "exercised actual control over [the Company]'s business and affairs").

[44] *Superior Vision Servs., Inc.*, 2006 WL 2521426, at *4 (emphasis added).

sufficient to allege that ReliaStar is a 'controlling stockholder' bound by fiduciary obligations."[45]

Last year, in *In re Morton's Restaurant Group, Inc. Shareholders Litigation*,[46] then-Chancellor Strine again held that the analysis for determining when a minority stockholder will be deemed controlling focuses on the stockholder's alleged ability to control the board:

> When a stockholder owns less than 50% of the corporation's outstanding stock, "a plaintiff must allege domination by a minority shareholder through actual control of corporate conduct." The bare conclusory allegation that a minority stockholder possessed control is insufficient. Rather, the Complaint must contain well-pled facts showing that the minority stockholder *"exercised actual domination and control over . . . [the] directors."* That is, under our law, a minority blockholder is not considered to be a controlling stockholder unless it exercises "such formidable voting and managerial power that [it], as a practical matter, [is] no differently situated than if [it] had majority voting control." Accordingly, *the minority blockholder's power must be "so potent that independent directors . . . cannot freely exercise their judgment, fearing retribution" from the controlling minority blockholder*.[47]

The Court concluded that plaintiffs had failed to plead facts supporting a rational inference that a 27.7% stockholder who had two employees on the board owed fiduciary obligations as a controlling stockholder. The Court stated that "[t]he fact that two employees of Castle Harlan sat on the board, without more, does not establish actual

---

[45] *Id*. at *5.

[46] 74 A.3d 656 (Del. Ch. 2013).

[47] *Id.* at 664-65 (emphasis added) (citations omitted).

domination of the board, especially given that there were eight directors not affiliated with Castle Harlan."[48]

Here, plaintiffs argue that the complaint's "allegations support the strong inference that KKR has 'actual control' over the 'corporate conduct' of KFN" because of the unique relationship between KKR and KFN, largely defined by the terms of the Management Agreement.[49] Plaintiffs specifically rely on the allegations that "KKR created KFN," "all of KFN's officers are employees of KKR and its affiliates," KFN is admittedly "completely reliant" on KKR's affiliate (KFA), "KFN's primary asset and reason for existence is a portfolio . . . that finance[s] the leveraged buyout activities of KKR," and KFN cannot extricate itself from KKR without paying a significant fee.[50] Plaintiffs' counsel acknowledged that their position, which really has nothing to do with the amount of voting power KKR held in KFN, raises a "novel question."[51]

In my opinion, the allegations of the complaint do not support a reasonable inference that KKR was a controlling stockholder of KFN within the meaning of this Court's precedents. Although these allegations demonstrate that KKR, through its affiliate, managed the day-to-day operations of KFN, they do not support a reasonable inference that KKR *controlled the KFN board*—which is the operative question under Delaware law—such that the directors of KFN could not freely exercise their judgment in

[48] *Id.* at 665.

[49] Pls.' Ans. Br. 21 (quoting *Cox Commc'ns Inc.*, 2006 WL 1586375, at *4).

[50] Compl. ¶¶ 2, 7, 45, 48-49; Pls.' Ans. Br. 17-25.

[51] Hearing Tr. 57 (July 29, 2014).

21

determining whether or not to approve and recommend to the stockholders a merger with KKR.

KKR's less than 1% position in KFN obviously would create no concern in the mind of KFN's directors that KKR possessed sufficient voting power to remove them from their positions if they rejected the merger proposal or took any other action KKR did not like. The complaint also is devoid of any allegation that KKR had a contractual right to appoint any (much less a majority) of the members of the KFN board, to dictate any action by the board, to veto any action of the board or to prevent the board from hiring advisors and gathering information in order to be fully-informed.

Plaintiffs' real grievance, as I see it, is that KFN was structured from its inception in a way that limited its value-maximizing options. According to plaintiffs, KFN serves as little more than a public vehicle for financing KKR-sponsored transactions and the terms of the Management Agreement make KFN unattractive as an acquisition target to anyone other than KKR because of KFN's operational dependence on KKR and because of the significant cost that would be incurred to terminate the Management Agreement. I assume all that is true. But, every contractual obligation of a corporation constrains the corporation's freedom to operate to some degree and, in this particular case, the stockholders cannot claim to be surprised. Every stockholder of KFN knew about the limitations the Management Agreement imposed on KFN's business when he, she or it

22

acquired shares in KFN.[52] They also knew that the business and affairs of KFN would be managed by a board of directors that would be subject to annual stockholder elections.[53]

At bottom, plaintiffs ask the Court to impose fiduciary obligations on a relatively nominal stockholder, not because of any coercive power that stockholder could wield over the board's ability to independently decide whether or not to approve the merger, but because of pre-existing contractual obligations with that stockholder that constrain the business or strategic options available to the corporation. Plaintiffs have cited no legal authority for that novel proposition, and I decline to create such a rule.[54]

The one case decided within the traditional framework of Delaware controlling stockholder law that plaintiffs do cite, *Williamson v. Cox Communications, Inc.,*[55] is readily distinguishable. There, the Court found at the pleadings stage that it was reasonably inferable that two stockholders (Cox and Comcast), together holding a 17.1% stake in At Home, were controlling stockholders. In doing so, the Court placed significant weight on the ability of Cox and Comcast "to shut down the effective

---

[52] As discussed above, the terms of the initial Management Agreement were in place and publicly disclosed when KKR Financial went public in 2005, and were publicly disclosed again in 2007 when KFN was created and became the successor entity.

[53] Section 6.5 of the KFN LLC Agreement provides for directors to be elected annually at meeting of its members. LLC Agreement § 6.5 (KFN Defs.' Op. Br. Ex. 5 § 6.5).

[54] A separate question is whether a sufficient number of the KFN directors were beholden to KKR at the time of the merger such that the board could not exercise independent judgment in considering the merger proposal, thereby rebutting the presumption of the business judgment rule. That issue is considered below in Section III.C.

[55] 2006 WL 1586375 (Del. Ch. June 5, 2006).

operation of the At Home board of directors by vetoing board actions."[56] Apart from the fact that a 17% stake represents a whole different ballgame than a less than 1% stake, the complaint here contains no well-pled facts from which it would be reasonable to infer that KKR could veto any action of the KFN board.

In sum, in deciding whether a stockholder owes a fiduciary obligation to the other stockholders of a corporation in which it owns only a minority interest, the focus of the inquiry is on whether the stockholder can exercise actual control over the corporation's board. Here, there are no well-pled facts from which it is reasonable to infer that KKR could prevent the KFN board from freely exercising its independent judgment in considering the proposed merger or, put differently, that KKR had the power to exact retribution by removing the KFN directors from their offices if they did not bend to KKR's will in their consideration of the proposed merger. For this reason, the allegations of the complaint fail to demonstrate that it is reasonably conceivable that KKR was a controlling stockholder under Delaware law. Thus, Count II fails to state a claim upon which relief can be granted.

C.    **Business Judgment Review Applies Because a Majority of the KFN Board was Disinterested and Independent**

Plaintiffs alternatively argue that entire fairness review of the merger should apply because the majority of the KFN board was not independent. Plaintiffs do not allege that any of the KFN directors were interested in the merger.

---

[56] *Id*. at *5.

Delaware law presumes the independence of corporate directors. To overcome that presumption, a plaintiff must allege facts as to the interest and/or lack of independence of the individual members of a board. "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[57] Plaintiffs can show a lack of independence "by pleading facts that support a reasonable inference that the director is beholden to a controlling person or 'so under their influence that their discretion would be sterilized.'"[58]

When the merger was approved, the KFN board had twelve members: Collins, Edwards, Farr, Finigan, Jr., Hazen, Hubbard, Kari, Licht, McAneny, Nuttall, Ryles, and Strothotte. Two of the board members, Farr and Nuttall, were high-level KKR employees at the time of the merger who did not vote on the transaction.[59] Defendants sensibly do not contend that they were independent.

In my opinion, it is reasonably conceivable that two other directors, Hazen and Hubbard, would not be found independent of KKR. According to the complaint, Hazen

---

[57] *Aronson*, 473 A.2d at 816.

[58] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009) (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)).

[59] Farr joined KKR in 2006. At the time of the merger, he served as the head of KKR Asset Management LLC, a subsidiary of KKR. He was also a Member of KKR, oversaw KKR's Capital Markets and Origination business, and sat on KKR's Risk Committee. Compl. ¶ 22. Nuttall joined KKR in 1996. At the time of the merger, he headed KKR's Global Capital and Asset Management Group. He was also involved in funds affiliated with KKR and has played a significant role in a number of KKR's private equity investments. Compl. ¶ 29.

had longstanding ties to KKR and, among other things, served as a Senior Advisor to KKR and as Chairman of KKR affiliate Accel-KKR at the time of the merger.[60] Plaintiffs allege that Hubbard is the Dean of Columbia University Business School, which recently received a $100 million donation from KKR co-founder Kravis, an alumnus.[61]

Plaintiffs do not challenge the independence of four of the KFN directors: Collins, Finigan Jr., Ryles, and Strothotte. For the reasons set forth below, I find that plaintiffs also have failed to allege facts under which it is reasonably conceivable that any of the four remaining directors lacked independence from KKR.

### 1. Deborah H. McAneny

The complaint alleges that McAneny was appointed by KKR to the board of KKR Financial, KFN's predecessor, in April 2005.[62] Plaintiffs stipulated that McAneny has been reelected (albeit in uncontested elections) each year since she joined the KKR

---

[60] Compl. ¶¶ 63-64. Defendants vigorously dispute the allegation that Hazen was a Senior Advisor to KKR at the time of the merger. KFN Defs.' Reply Br. 18-19. They cite to the 2014 Proxy, which states that Hazen served as a Special Advisor to KKR from 2001 to 2011. 2014 Proxy at 223. The 2014 Proxy also states that Accel-KKR, of which Hazen was the Chairman, "is not an investment fund managed by the KKR Group and operates independently from it." Although I am skeptical of the accuracy of the complaint's allegations concerning Hazen's relationship with KKR given these disclosures, I accept them as true for purposes of this decision.

[61] *See Off v. Ross*, 2008 WL 5053448, at *11 (Del. Ch. Nov. 26, 2008) ("Ross's substantial donation [of $100 million] raises considerable doubt as to the independence of Dolan. . . . [T]he donation of such a prodigious sum coupled with the fact that Ross became the eponym of the benefiting institution calls into question the independence of Defendant Dolan.").

[62] Compl. ¶ 61.

Financial board nine years ago.[63]  It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder.[64]  The complaint fails to allege any additional facts to support the contention that McAneny was not independent.  Consequently, plaintiffs have failed to allege facts that support a reasonably conceivable inference that McAneny was beholden to KKR.

### 2.  Robert L.  Edwards

Plaintiffs argue that Edwards is beholden to KKR because he "owes his position as CEO of Safeway to KKR-affiliated directors on the Safeway board." [65]  This assertion is conclusory.  In March 2004, *after* KKR liquidated its holdings in Safeway, Edwards joined Safeway as its Executive Vice President and Chief Financial Officer.[66]  At that time, there allegedly were four KKR-affiliated directors on the Safeway board, including

---

[63] Hearing Tr. 19 (July 29, 2014).

[64] *See Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984) (finding that directors who were "personally selected" by a 47% stockholder did not lack independence); *Frank v. Elgamal*, 2014 WL 957550, at *22 (Del. Ch. Mar. 10, 2014) ("Merely because a director is nominated and elected by a large or controlling stockholder does not mean that he is necessarily beholden to his initial sponsor."); *Blaustein v. Lord Baltimore Capital Corp.*, 2013 WL 1810956, at *18 n.114 (Del. Ch. Apr. 30, 2013) (stating that allegations that a director was appointed to the board by and has consistently voted with alleged controller are insufficient to challenge the director's independence), *aff'd*, 84 A.3d 954 (Del. 2014); *Western Nat. Corp. S'holders Litig.*, 2000 WL 710192, at *15 (Del. Ch. May 22, 2000) ("As a preliminary matter, I note that even if American General nominated some of the outside directors . . . such nomination, without more, does not mandate a finding that these directors were beholden to American General . . . .").

[65] Pls.' Ans. Br. at 34.

[66] Compl. ¶¶ 64(a), 67.

27

KKR co-founder Roberts and defendant Hazen. The complaint does not allege, however, that those KKR-affiliated directors ever constituted a majority of the Safeway board or that they had the power to hire or promote Edwards.[67] Absent such allegations, the complaint fails to allege facts that support a reasonably conceivable inference that Edwards was beholden to KKR.[68]

### 3. Ross J. Kari

The complaint does not allege any facts suggesting a direct relationship between Kari and KKR. Plaintiffs instead attempt to impugn Kari's independence based on a transitive theory under which Kari is not independent from KKR because he allegedly is beholden to Hazen, who allegedly is beholden to KKR. Specifically, the complaint alleges that Kari and Hazen previously worked together at Wells Fargo.[69] Kari was

---

[67] Because Safeway is a public corporation, one easily could ascertain the full composition of its board of directors at relevant times. In fact, plaintiffs attached to their answering brief Safeway's Form 8-K, filed on October 19, 2004, which shows that KKR co-founder Roberts left the Safeway board in October 2004, seven months after Edwards joined Safeway as CFO in March 2004.

[68] Plaintiffs cite to *Rales v. Blasband* and *Harbor Finance Partners v. Huizenga* as support for their contention that Edwards was beholden to KKR. The non-conclusory allegations made by plaintiffs here do not approach the active relationships that existed in either case. *See Rales v. Blasband* , 634 A.2d 927 (Del. 1993) (finding that it could be inferred that Ehrlich was beholden to the Rales brothers where Ehrlich was president, earning annual compensation of $300,000, and his two brothers were vice presidents of a company in which the Rales brothers were directors and owned a majority stake); *Harbor Finance Partners v. Huizenga*, 751 A.2d 879 (Del. Ch. 1999) (finding reasonable doubt that Hudson could impartially evaluate demand that would have an adverse effect on his brother-in-law, Huizenga, because of their familial relationship and pattern of mutually advantageous business relationships that spanned over 30 years).

[69] Compl. ¶ 18.

28

employed by Wells Fargo for 18 years, beginning in 1983, including as Chief Financial Officer from 1998 to 2001.[70] Hazen was employed by Wells Fargo for 31 years, including as Vice Chairman from 1978 to 1984, President and COO from 1984 to 1995, Chairman and President and CEO from 1995 to 1998, and Chairman from 1998 to 2001.[71]

Although the complaint alleges that Kari "owed [his] advancement and success to [Hazen] for many years," the complaint offers no factual allegations to support this conclusory allegation.[72] Plaintiffs' argument can be properly characterized as asserting that Kari is beholden to Hazen by virtue of their past business relationship. But, this Court has held in the context of dismissing claims under Rule 12(b)(6) that the "naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence."[73] This conclusion has particular force here, where the past business relationship ended *twelve years before* the transaction at issue in this case.

---

[70] Compl. ¶ 68.

[71] *Id.*

[72] *Id.*

[73] *Orman v. Cullman*, 794 A.2d 5, 27 (Del. Ch. 2002); *see also Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 980-81 (Del. Ch. 2000) ("Second, plaintiffs assert that Turner dominated and controlled Hunt. In support, they allege that Turner controls Hunt because of their long-standing 15-year professional and personal relationship. This allegation alone fails to raise a reasonable doubt that Hunt could not exercise his independent business judgment in approving the transaction."); *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013) ("Our law is clear that mere allegations that directors are friendly with, travel in the same social circles, or have past business relationships with the proponent of a transaction or the person they are investigating, are not enough to rebut the presumption of independence."), *aff'd sub nom.*, *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635 (Del. 2014).

Thus, the complaint fails in my view to allege facts that support a reasonably conceivable inference that Kari was not independent from KKR when the KFN board approved the merger in 2013, because of a business relationship Kari had with Hazen, having nothing to do with KKR, which ended twelve years earlier.

### 4. Ely L. Licht

Plaintiffs assert the same transitive theory to challenge the independence of Licht as they did with Kari. Specifically, plaintiffs allege that Licht lacks independence from KKR by virtue of being beholden to Hazen because Licht was employed at Wells Fargo for 18 years that overlapped with Hazen's tenure there, including when Licht was Chief Credit Officer from 1998 to 2001 and Executive Vice President for Credit Administration from 1990 to 1998.[74] For the reasons discussed above, this past business relationship does not raise a reasonable inference that Licht was not independent from KKR in 2013.

The complaint further alleges that Licht is "indebted" to KKR because he was the Executive Vice President and Chairman of Credit Policy of Capmark from March 2007 to February 2009 and served as a consultant to Capmark from March 2009 to August 2009.[75] The complaint alleges that as of March 31, 2006, an investor group led by KKR owned 75% of Capmark. The complaint does not allege, however, that KKR continues to own a position in Capmark or that Licht continues to work for Capmark.[76] Thus,

---

[74] Compl. ¶ 68.

[75] Compl. ¶69.

[76] Capmark Fin. Gp. Inc., Application for Qualification of Indentures (Form T-3) 1 (July 11, 2011). Licht's tenure at Capmark concluded no later than October of 2009 when the

plaintiffs' contention that Licht is beholden to KKR again rests solely on a previous business relationship, which is insufficient in my view to support a reasonable inference that Licht was beholden to KKR in 2013.

\* \* \* \* \*

For the foregoing reasons, I conclude that plaintiffs have failed to allege facts that support a reasonable inference that eight of the twelve KFN directors, constituting eight of the ten who voted on the transaction, were not independent from KKR. Thus, plaintiffs have failed to rebut the presumption that the business judgment rule applies to the KFN board's decision to approve the merger. Plaintiffs have not challenged the merger as being irrational or on the grounds of waste or gift, nor could the allegations of the complaint support such a claim. Accordingly, Count I of the complaint, asserting that the members of the KFN board breached their fiduciary duties of due care and loyalty by agreeing to the merger, fails to state a claim upon which relief may be granted.

### D. Business Judgment Review Applies Because KFN's Disinterested Stockholders Approved the Merger in a Fully Informed Vote

Relying on Chancellor Strine's decision last year in *Morton's* (discussed above) and his earlier decision in *Harbor Finance Partners v. Huizenga*,[77] defendants argue that, because the merger did not involve a controlling stockholder and was approved by a fully

---

company filed for bankruptcy. Although this information was not contained in the complaint, I take judicial notice of Capmark's SEC filings to this effect, which cannot reasonably be disputed. *See Narrowstep, Inc.*, 2010 WL 5422405, at \*5.

[77] 751 A.2d 879 (Del. Ch. 1999).

informed vote of KFN's stockholders, the business judgment rule applies and insulates the merger from all attacks other than on the grounds of waste. Put differently, defendants argue that, even if a majority of the KFN's directors were not independent, the business judgment presumption still would apply because of the effect of untainted stockholder approval of the merger.

Plaintiffs do not take issue with defendants' position concerning the legal effect of a fully informed vote where a controlling stockholder is not involved. They instead argue that the complaint alleges that the 2014 Proxy omitted material information.[78] They make this argument even though the complaint does not contain a disclosure claim *per se* and even though plaintiffs made no effort to enjoin the stockholder vote on the merger based on any alleged disclosure deficiencies.

### 1. Plaintiffs' Disclosure Challenges

For stockholder approval of any corporate action to be valid, the vote of the stockholders must be fully informed.[79] In this context, that means that the 2014 Proxy must have disclosed all facts material to the KFN stockholders. Defendants, who have asserted this defense, bear the burden of establishing that the 2014 Proxy disclosed all material facts.[80]

---

[78] Pls.' Ans. Br. 40-46.

[79] *See Citron v. E.I. DuPont de Nemours & Co.*, 584 A.2d 490, 502-03 (Del. Ch. 1990).

[80] *See Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 846 (Del. 1987).

In an effort to avoid the effect of stockholder approval, plaintiffs claimed that the 2014 Proxy omitted material facts. The alleged omissions appear to concern three matters: (1) the independence of the Transaction Committee, (2) the role of Hazen and Farr in the merger negotiations, and (3) the adequacy of the disclosures regarding the financial analysis of Sandler O'Neill. For reasons set forth below, I find that these disclosure challenges are without merit and thus that defendants have established that the stockholder vote was fully informed.[81]

### a. The Independence of the Transaction Committee

Plaintiffs' first disclosure argument is difficult to discern. Citing two parts of the 2014 Proxy, plaintiffs assert that "Defendants . . . have claimed that their directors, including the members of the Transaction Committee, are independent."[82] Without identifying any fact concerning any particular director that allegedly was omitted from the 2014 Proxy, plaintiffs then recite a legal proposition: "Whether directors are conflicted – particularly those charged with negotiating the terms of a strategic transaction – is an undeniably material fact that must be disclosed."[83]

---

[81] *See Solomon v. Armstrong*, 747 A.2d 1098, 1127-32 (Del. Ch. 1999) (determining on motion to dismiss that plaintiffs disclosure claims were without merit and thus defendant satisfied burden of establishing that stockholder vote was fully informed), *aff'd*, 746 A.2d 277 (Del. 2000); *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 616-17 (Del. Ch. 1999) (same).

[82] Pls.' Ans. Br. 41-42. Both of the cited parts of the 2014 Proxy refer only to the independence of the members of the Transaction Committee and not to any other director.

[83] *Id.* at 42.

Plaintiffs appear to be taking issue with the fact that the 2014 Proxy did not state that some or all of the members of the Transaction Committee were not independent. As an initial matter, the factual premise underlying plaintiffs' position rings hollow because, as discussed above, the complaint fails to allege facts sufficient to overcome the presumption of independence of any of the members of the Transaction Committee.[84] Even if that were not the case, however, the duty of disclosure does not require directors to admit wrongdoing. To necessitate such a disclosure would require that directors "engage in self-flagellation and draw legal conclusions," in conflict with well settled Delaware law.[85] Consequently, plaintiffs have failed to identify any deficiencies in the 2014 Proxy regarding the independence of the members of the Transaction Committee.

### b. Hazen's and Farr's Role in the Negotiations

Plaintiffs' second disclosure argument appears to concern Hazen's and Farr's roles in the merger negotiations. Plaintiffs assert in their brief that the complaint alleges that "Hazen, not the Transaction Committee, was truly responsible for heading the negotiations between KKR and KFN, a direct challenge to the story told by the Company

---

[84] The Transaction Committee consisted of six members. Plaintiffs did not even challenge the independence of four of them (Collins, Finigan, Ryle Strothote) and, for the reasons discussed above, it is not reasonably inferable from the allegations of the complaint that either of the other two (Edwards and Kari) was not independent.

[85] *Stroud v. Grace*, 606 A.2d 75, 84 n.1 (Del. 1992) ("We recognize the long-standing principle that to comport with its fiduciary duty to disclose all relevant material facts, a board is not required to engage in 'self-flagellation' and draw legal conclusions implicating itself in a breach of fiduciary duty from surrounding facts and circumstances prior to a formal adjudication of the matter.").

regarding the sales process."[86]  In an accompanying string citation, plaintiffs cite the allegation that the "Proxy contains no explanation as to why the admittedly and clearly conflicted Farr spearheaded the negotiation of [the termination fee in the Management Agreement]."[87]

In fact, the 2014 Proxy explains in detail the roles Hazen and Farr played in the merger negotiations.  Specifically, it discloses that Kravis and Roberts informed Hazen (through Farr) in October 2013, that KKR was considering making an offer;[88] that Hazen relayed that information to the KFN board on October 22, 2013;[89] that Hazen and Farr had discussions regarding the possibility of modifying the Termination Fee in the management agreement, but that Farr was informed by KKR that they were unwilling to do so;[90] that Hazen attended a meeting of the Transaction Committee on November 21, 2013, for the purpose of updating the members of the Transaction Committee on KFN's financial performance and viability as a stand-alone entity;[91] and that Hazen (at Edwards' request) contacted Roberts on December 10, 2013, to request that KKR increase the proposed ratio to 0.52 KKR common units per KFN common share.[92]  The 2014 Proxy

---

[86] Pls.' Ans. Br. 43.

[87] *Id*. at 44.

[88] 2014 Proxy at 31.

[89] *Id*.

[90] *Id*.

[91] *Id*. at 33.

[92] *Id*. at 35.

also discloses Hazen's and Farr's relationships with KKR, which form the basis for plaintiffs' contention that Hazen and Farr were not independent.[93]

Plaintiffs' real grievance appears to be that the 2014 Proxy did not explain "why" Hazen and Farr allegedly spearheaded the merger negotiations. But, as this Court has held, "[a]sking 'why' does not state a meritorious disclosure claim."[94]

### c.     Sandler O'Neill's Financial Analysis

Plaintiffs challenge the adequacy of the disclosures concerning Sandler O'Neill's financial analysis based on the allegation in their complaint that "[t]he Proxy provides no explanation why KFN, a sophisticated investment vehicle controlled by a global private equity firm, did not prepare basic management financial projections to assist Sandler O'Neill in its valuation analysis."[95] Once again, however, "asking why" does not state a meritorious disclosure claim.

* * * * *

For the foregoing reasons, I find that plaintiffs' challenges to the 2014 Proxy are without merit and that the KFN stockholder vote approving the merger was fully informed.[96]

---

[93] *Id*. at 223. The 2014 Proxy discloses that Hazen was a Senior Advisor for the KKR Group from 2001 to 2011. As discussed above, defendants vigorously dispute that Hazen held this position at the time of the merger.

[94] *See In re Sauer-Danfoss*, 65 A.3d at 1131.

[95] Pls.' Ans. Br. 43 (citing Compl. ¶ 131).

[96] In their answering brief, plaintiffs bemoan the fact that identifying disclosure violations was made more difficult by their inability to take discovery. Pls.' Ans. Br. 46. Plaintiffs

36

## 2. The Effect of Stockholder Approval

As noted above, plaintiffs do not disagree with defendants' position that the legal effect of a fully-informed stockholder vote of a transaction with a non-controlling stockholder is that the business judgment rule applies and insulates the transaction from all attacks other than on the grounds of waste, even if a majority of the board approving the transaction was not disinterested or independent. This position is supported by numerous decisions, including then-Vice Chancellor Jacobs' 1995 decision in *In re Wheelabrator Technologies, Inc. Shareholders Litigation*,[97] and then-Vice Chancellor Strine's later decision in *Harbor Finance*, which, in turn, recited numerous supporting authorities.[98]

In light of the Delaware Supreme Court's 2009 decision in *Gantler v. Stephens*,[99] there has been some debate as to whether the standard articulated in *Wheelabrator, Harbor Finance* and other decisions remains good law when the stockholder vote is

---

are not entitled to discovery to make disclosure challenges as a matter of right. *See Weinberger v. Palm Beach, Inc.*, 1985 WL 11581, at *2 (Del. Ch. July 9, 1985) ("[P]laintiffs are not entitled to discovery in search of a new cause of action. To the extent that the complaint, as it presently reads, fails to state a cause of action, any discovery effectively would be in search of a new cause of action.") (citation omitted).

[97] 663 A.2d 1194, 1200 (Del. 1995) (holding that "the effect of the shareholder vote" in a case involving a duty of loyalty claim challenging an interested transaction was to "invoke the business judgment standard, which limits review to issues of gift or waste with the burden of proof resting upon the plaintiffs").

[98] *Harbor Fin.*, 751 A.2d at 890 (Del. Ch. 1999) (citing *Marciano v. Nakash*, 535 A.2d 400, 405 n.3 (1987); *In re General Motors Class H S'holders Litig.*, 734 A.2d 611, 616 (Del. Ch. 1999); *Solomon v. Armstrong*, 747 A.2d 1098, 1113-17 (Del. Ch. 1999)).

[99] *Gantler v. Stevens*, 965 A.2d 695 (Del. 2009).

37

statutorily required as opposed to a purely voluntary stockholder vote. For reasons discussed below, which are similar in substance to those articulated by Vice Chancellor Laster in a recent article,[100] I do not read *Gantler* to have altered the legal effect of a stockholder vote when it is statutorily required. Instead, I read it simply to clarify the meaning of the term "ratification."

In *Gantler*, stockholders approved a reclassification of the corporation's shares. A stockholder vote was required under 8 *Del. C.* § 242 because the reclassification required an amendment to the corporation's certificate of incorporation. Applying the standard articulated in *Wheelabrator* and its progeny, this Court dismissed a breach of fiduciary duty claim challenging the reclassification. After finding that a majority of the board may have been interested or not independent when it decided to effect the reclassification, the Court determined that the reclassification was subject to the business judgment rule because it had been approved by a majority of the corporation's unaffiliated stockholders.[101]

On appeal, the Delaware Supreme Court reversed, finding that the complaint sufficiently alleged that the proxy disclosures were materially misleading. After doing so, Justice Jacobs, writing for the Court, quoted at length from his Court of Chancery decision in *Wheelabrator* to explain that the "scope and effect of the common law

---

[100] *See* J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 Wm. Mitchell L. Rev. 1443 (2014).

[101] *Gantler v. Stephens*, 2008 WL 401124, at *1, 15-23 (Del. Ch. Feb. 14, 2008).

doctrine of shareholder ratification is unclear."[102] He then wrote that, "[t]o restore coherence and clarity to this area of our law, we hold that the scope of the shareholder ratification doctrine must be limited to its so-called 'classic' form; that is, to circumstances where a fully informed shareholder vote approves director action that does *not* legally require shareholder approval in order to become legally effective."[103] The Court further explained that "the only director action or conduct that can be ratified is that which the shareholders are specifically asked to approve."[104]

The Supreme Court in *Gantler* did not expressly address the legal effect of a fully informed stockholder vote when the vote is statutorily required. Having determined that the proxy disclosures were materially misleading, the Supreme Court did not need to reach that question.

Although the language from the Supreme Court's decision quoted above could be interpreted to imply that the legal effect of a fully informed stockholder vote would be different when the vote was voluntary as opposed to statutorily required, I do not read it that way. To read it that way would mean that the Supreme Court intended to overrule extensive precedent, including Justice Jacobs' own earlier decision in *Wheelabrator*, which involved a statutorily required stockholder vote to consummate a merger.[105] Had

---

[102] *Gantler II*, 965 A.2d at 712.

[103] *Id.* at 713.

[104] *Id.*

[105] Wheelabrator involved the merger of Wheelabrator Technologies, Inc. ("WTI") into a wholly-owned subsidiary of Waste Management, Inc. ("Waste") in a stock-for-stock

the Supreme Court intended to do so, I believe the Court would have expressly stated such an intention.[106] Instead, I read the Supreme Court's discussion of the doctrine of ratification in *Gantler* to have been intended simply to clarify that the term "ratification" applies only to a voluntary stockholder vote.[107] As the Supreme Court stated in a footnote at the end of its decision, "[t]his Opinion clarifies that 'ratification' legally describes only corporate action where stockholder approval is not statutorily required for its effectuation."[108]

* * * * *

---

merger whereby Waste went from being a 22% stockholder of WTI to a 55% stockholder of WTI. Similar to the merger at issue in this case, a stockholder vote was statutorily required (*see* 8 Del. C. § 251(c)) and the transaction was "conditioned upon the approval of a majority of WTI's disinterested stockholders." *Wheelabrator*, 663 A.2d at 1197.

[106] By contrast, for example, the Supreme Court in *Gantler* did expressly overrule *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985), to the extent it held that the "cleansing" of a ratifying stockholder vote is to "extinguish" a claim altogether as opposed to subjecting the challenged director action to business judgment review. *Gantler*, 965A.2d at 713 n. 54.

[107] Notably, in two decisions involving stockholder approval of merger transactions issued after the Supreme Court's decision in *Gantler*, then-Chancellor Strine reiterated the view that approval of disinterred stockholders has the effect of invoking business judgment review. *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 793 n.113 (Del. Ch. 2011)("[I]t has long been my understanding of Delaware law, that the approval of an uncoerced, disinterested electorate of a merger (including a sale) would have the effect of invoking the business judgment standard of review."); *In re Morton's*, 74 A.3d at 663 n.34. ("[W]hen disinterested approval of a sale to an arm's-length buyer is given by a majority of stockholders who have had the chance to consider whether or not to approve the transaction for themselves, there is a long line and sensible tradition of giving deference to the stockholders' voluntary decision, invoking the business judgment rule standard of review, and limiting any challenges to the difficult argument that the transaction constituted waste.").

[108] *Gantler II*, 965 A.2d at 714 n.55.

40

For the foregoing reasons, I conclude that, even if plaintiffs had pled facts from which it was reasonably inferable that a majority of KFN's directors were not independent, the business judgment standard of review still would apply to the merger because it was approved by a majority of the shares held by disinterested stockholders of KFN in a vote that was fully informed. Accordingly, and because plaintiffs have not alleged a claim for waste or gift, Count I of the complaint is dismissed for this independent reason.

### E.    Aiding and Abetting

Count III of the complaint alleges that KKR and two of its subsidiaries that were parties to the merger agreement (Holdings and Copal) aided and abetted the individual defendants' breach of fiduciary duties. "To state a claim for aiding and abetting, a plaintiff must allege: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach."[109] An aiding and abetting claim "may be summarily dismissed based upon the failure of the breach of fiduciary duty claims against the director defendants."[110] Having found that Count I fails to state a claim for breach of breach of fiduciary duty claim against the individual defendants, Count III also is dismissed.

---

[109] *Dent v. Ramtron Int. Corp.*, 2014 WL 2931180, at *17 (Del. Ch. June 30, 2014).

[110] *Meyer v. Alco Health Servs. Corp.*, 1991 WL 5000, at *2 (Del. Ch. Jan. 17, 1991).

41

## IV.     CONCLUSION

For the foregoing reasons, defendants' motions to dismiss all three counts of the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim for relief are GRANTED.  The complaint is dismissed in its entirety with prejudice.

**IT IS SO ORDERED.**