# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JEFFERY J. SHELDON and ANDRAS KONYA, M.D., PH.D., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2017-0838-MTZ |
| PINTO TECHNOLOGY VENTURES, L.P., PINTO TV ANNEX FUND, L.P., PTV SCIENCES II, L.P., RIVERVEST VENTURE FUND I, L.P., RIVERVEST VENTURE FUND II, L.P., RIVERVEST VENTURE FUND II (OHIO), L.P., BAY CITY CAPITAL FUND IV, L.P., BAY CITY CAPITAL FUND IV CO-INVESTMENT FUND, L.P., REESE TERRY and CRAIG WALKER, M.D., | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  November 1, 2018
Date Decided:  January 25, 2019

Thad J. Bracegirdle and Scott B. Czerwonka, WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, Delaware; Jeff Joyce, JOYCE & MCFARLAND LLP, Houston, Texas, *Attorneys for Plaintiffs*.

Brian C. Ralston and Jacqueline A. Rogers, POTTER ANDERSON CORROON LLP, Wilmington, Delaware; Danny David and Rebecca Huddle, BAKER BOTTS LLP, Houston, Texas, *Attorneys for Reese Terry and Craig Walker, M.D.*

Bruce E. Jameson and Samuel L. Closic, PRICKETT, JONES & ELLIOTT, P.A., Wilmington, Delaware; B. Russell Horton, GEORGE BROTHERS KINCAID & HORTON, L.L.P., Austin, Texas, *Attorneys for Pinto Technology Ventures, L.P., Pinto TV Annex Fund, L.P., PTV Sciences II, L.P., RiverVest Venture Fund I, L.P., RiverVest Venture Fund II, L.P., RiverVest Venture Fund II (Ohio), L.P., Bay City Capital Fund IV, L.P., Bay City Capital Fund IV Co-Investment Fund, L.P.*

**ZURN, Vice Chancellor.**

Plaintiffs Jeffrey J. Sheldon and Andras Konya, M.D., Ph.D, obtained stock early in the corporate life of non-party IDEV Technologies, Inc. IDEV raised capital to support its growth in the years that followed. In 2009, new management created and implemented a strategic plan to secure long-term capital, supported in the short term by secured bridge funding from existing investors. In July 2010, IDEV converted its preferred stock to common, enacted a 100 to 1 reverse stock split, and raised capital from new and current investors by issuing new preferred stock.

One result of that financing was that stockholders who did not invest, including the plaintiffs, experienced severe dilution. Three years later, after Abbott Laboratories purchased IDEV for more than $300 million, the plaintiffs tried to increase their share by suing some of IDEV's venture capital stockholders and members of IDEV's board and management in Texas state court.

The defendants in Texas, including all defendants here, responded by seeking to enforce a Delaware forum selection clause in IDEV's governing stockholders' agreement. The parties litigated all the way to the Supreme Court of Texas, which enforced the provision against the plaintiffs. The plaintiffs responded as instructed, suing in this Court for breach of fiduciary duty, aiding and abetting of those breaches, and unjust enrichment.

Before me are the defendants' motions to dismiss. The defendants' main argument is that the plaintiffs' claims are derivative. If the defendants are right, the

plaintiffs' primary breach of fiduciary duty claims fail as a matter of law because the plaintiffs do not satisfy the requirements of Court of Chancery Rule 23.1, and they lost standing to pursue a derivative suit after Abbott acquired IDEV. The plaintiffs' response is two-fold: first, that the defendants are judicially estopped from arguing the plaintiffs' claims are derivative because of positions the defendants took in enforcing the forum selection clause in Texas; and second, that the plaintiffs can assert their claims directly under *Gentile v. Rossette*, because of the alleged presence of a control group.[1]

As explained below, the defendants are not estopped from asserting the plaintiffs' claims are derivative, and *Gentile* does not apply because the plaintiffs failed to plead the existence of a control group. As a result, I must dismiss the plaintiffs' claims with prejudice.

## I.  BACKGROUND

I draw the facts from the allegations in, and documents incorporated by reference or integral to, the Complaint.[2]

---

[1]  906 A.2d 91 (Del. 2006).

[2]  *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (providing that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint). All citations to the Complaint are to Plaintiffs' Verified Amended Complaint, Docket Item ("D.I.") 25 ("Compl.").

## A. Parties and Relevant Non-Parties

Non-party IDEV Technologies, Inc. ("IDEV") is a Delaware corporation with its principal office in Webster, Texas.[3] IDEV develops and manufactures devices used in interventional radiology, vascular surgery, and interventional cardiology.[4]

Plaintiff Jeffrey J. Sheldon founded IDEV in December 1999.[5] He served as Chief Executive Officer of IDEV from that time until he resigned in January 2008.[6] Before July 2010, Sheldon owned IDEV common stock and Series B Preferred Stock.[7] Plaintiff Andras Konya, M.D., Ph.D, was the co-inventor of certain technology relating to vascular stents licensed to IDEV in 2000 by MD Anderson Cancer Center.[8] Konya received shares of IDEV common stock through his licensing arrangement with IDEV.[9] Konya then served as a consultant to IDEV in

---

[3] Compl. ¶ 4.

[4] *Id.* ¶ 4.

[5] *Id.* ¶ 17.

[6] *Id.* ¶¶ 4, 17.

[7] *Id.* ¶ 18. Sheldon alleges that he owned Series A Preferred Stock, but the Schedules to the Shareholders Agreement specify that Sheldon owned 45,998 shares of Series B Preferred Stock. Aff. of Samuel L. Closic in Supp. of Stockholder Defs.' Br. in Supp. of Mot. to Dismiss Pls.' Verified Am. Compl. (D.I. 31), Ex. 3 Schedules 1 and 2. This appears not to matter, as Defendants did not press the point, and nothing suggests that Sheldon would have different rights as a holder of Series A Preferred Stock rather than Series B Preferred Stock.

[8] Compl. ¶ 5.

[9] *Id.*

varying roles and frequencies between 2000 and late 2012.[10]  I refer to Sheldon and Konya together as "Plaintiffs."

Defendants Pinto Technology Ventures, L.P., Pinto TV Annex Fund, L.P. and PTV Sciences II, L.P. (together, "PTV") are affiliated Delaware limited partnerships.[11]  Defendants RiverVest Venture Fund I, L.P., RiverVest Venture Fund II, L.P., and RiverVest Venture Fund II (Ohio), L.P. (together, "RiverVest") are also affiliated Delaware limited partnerships.[12]  And defendants Bay City Capital Fund IV, L.P. and Bay City Capital Fund IV Co-Investment Fund, L.P. (together, "Bay City") are affiliated Delaware limited partnerships as well.[13]  I refer to PTV, RiverVest, and Bay City collectively as the "Venture Capital Defendants."

Reese Terry and Craig Walker, M.D. (together, "Individual Defendants," and together with the Venture Capital Defendants, "Defendants") were directors of IDEV.[14]  Christopher Owens was IDEV's President and CEO, as well as a director, while William W. Burke was IDEV's CFO.[15]

---

[10]  *Id*. ¶¶ 5, 17.

[11]  *Id*. ¶ 6.

[12]  *Id*. ¶ 7.

[13]  *Id*. ¶ 8.

[14]  *Id*. ¶¶ 9-10.

[15]  *Id*. ¶¶ 11-12.

**B.     IDEV Grows, Completing Multiple Financing Rounds in the 2000s.**

IDEV stockholders entered into a stockholders agreement in 2000.[16]  IDEV required additional financing "for [its] growth and solvency."[17]  In 2004, 2006, and 2008, IDEV completed Series A, B, and C financings.[18]  The Series A round raised $1.8 million, and included PTV.[19]  The Series B and C rounds raised $24 million and $25 million respectively.[20]  Some previous investors, such as PTV, as well as new investors, including RiverVest and Bay City, participated in the Series B and C rounds.[21]  Because the Venture Capital Defendants invested in various rounds, they "collectively controlled over 60% of the Company's issued and outstanding shares."[22]  "Several of the amendments to the shareholders agreement coincided with [these] financing[s]."[23]

In early 2010, the operative stockholders agreement was the Fourth Amended and Restated Shareholders Agreement, dated March 4, 2008 (the "Shareholders

---

[16]  *Sheldon v. Pinto Tech. Ventures, L.P.*, 477 S.W.3d 411, 413 (Tex. App. 2015) ("*Sheldon I*").

[17]  *Pinto Tech. Ventures, L.P. v. Sheldon*, 526 S.W.3d 428, 434 (Tex. 2017) ("*Sheldon II*").

[18]  *Sheldon II*, 526 S.W.3d at 434; *see also* Closic Aff. Exs. 4-5.

[19]  *Sheldon II*, 526 S.W.3d at 434; Closic Aff. Ex. 3 Schedule 2.

[20]  *Sheldon II*, 526 S.W.3d at 434.

[21]  Closic Aff. Ex. 3, Schedule 2.

[22]  Compl. ¶ 23.

[23]  *Sheldon II*, 526 S.W.3d at 434.

Agreement").[24]  At that time, Sheldon owned 1,250,000 shares of IDEV common stock and 45,998 shares of IDEV Series B Preferred Stock, while Konya owned 650,000 shares of common stock.[25]  Sheldon and Konya respectively owned about 2.5% and 1.25% of the total outstanding shares of IDEV as of early 2010.[26]  Sheldon was a Key Shareholder and Significant Shareholder under the Shareholders Agreement, while Konya was only a Key Shareholder.[27]  There were twenty Key Shareholders and seventy Significant Shareholders, counting affiliated funds separately.[28]  The Shareholders Agreement defined "Shareholder" as "collectively, the Key Shareholders and the Significant Shareholders."[29]  The Shareholders could amend the Shareholders Agreement by a 60% vote.[30]

In this case, the most relevant provision of the Shareholders Agreement is Section 7, which comprises a voting agreement.  Under Section 7, PTV, RiverVest, and Bay City could each appoint one director to the Board.[31]  A majority of those

---

[24] Closic Aff. Ex. 3.

[25] Compl. ¶ 18.

[26] *Id.*

[27] Closic Aff. Ex. 3 § 1(f) & (p); *see also id*. Schedules 1 and 2.

[28] Closic Aff. Ex. 3 Schedules 1 and 2.

[29] *Id*. § 1(o).

[30] *Id*. § 18(a); Compl. ¶ 20.

[31] Closic Aff. Ex. 3 § 7(a).

7

directors then chose two additional directors.[32] The sixth identified director was IDEV's CEO.[33] Every Shareholder, including Sheldon and Konya, agreed to "take all necessary or desirable actions" to elect these directors.[34] Other than electing directors, "[e]ach Shareholder [] retain[ed] at all times the right to vote the Shareholder's [shares] in its sole discretion on all matters."[35]

### C. IDEV Recapitalizes And Receives Additional Capital Through The Financing In 2010.

In 2009, IDEV "hired a new executive management team, restructured its sales force, secured bridge funding from its current investor group and implemented a new strategic plan that was focused on leveraging and fully developing" its core technologies.[36] IDEV also determined that it would need "additional equity capital . . . in order to fund significant investments . . . critical to the Company's future growth prospects."[37] Late in 2009, management started a financing process.

In the first half of 2010, management "met with more than fifteen venture capital and strategic investors," and conducted follow-up meetings and site visits

---

[32] *Id.* § 7(a)(v).

[33] *Id.* § 7(a)(iv).

[34] *Id.* § 7(a).

[35] *Id.* § 7(c).

[36] Transmittal Aff. of Scott B. Czerwonka in Supp. of Pls.' Combined Answering Br. in Response to Defs.' Mots. to Dismiss Pls.' Verified Am. Compl. (D.I. 34), Ex. D at 3.

[37] *Id.*

with interested investors.[38] "After extended discussions with [the] new investors and an evaluation of their proposed terms, the Company selected" a proposal, which included both new and current investors.[39]

IDEV implemented the financing in July 2010 (the "Financing"). The Financing consisted of several transactions that can be separated into two series. The first series related to IDEV's capital structure and stockholders, and set the stage for the second series, which raised new capital.

In the first series, the Venture Capital Defendants voted to convert all of IDEV's preferred stock to common stock.[40] The Venture Capital Defendants then acted by written consent to amend IDEV's Certificate of Incorporation to accomplish two goals. The first was to effect a reverse stock split of common shares, reducing the number of outstanding shares by turning every 100 shares into a single share.[41] The second was to authorize and issue a new class of shares, Series B-1 Preferred Stock.[42] Finally, IDEV and the Venture Capital Defendants amended the

---

[38] *Id.*

[39] *Id.*

[40] Compl. ¶ 29(a).

[41] *Id.* ¶ 29(b).

[42] *Id.*

9

Shareholders Agreement to eliminate certain preemptive rights held by Significant Shareholders, including Sheldon.[43]

Having set the stage, IDEV raised new money. IDEV described its plan to raise more than $40 million in a Confidential Information Statement.[44] IDEV raised $27 million in an initial closing by selling Series B-1 shares to new and existing investors (including each of the Venture Capital Defendants).[45] There was also an exchange and purchase offering, in which previous holders of preferred stock could convert their common shares into Series A-2 Preferred Stock, provided they also purchased Series B-1 Preferred Stock.[46] The Confidential Information Statement warned stockholders that "[t]he Transactions result in substantial dilution to Preferred Stockholders, and the dilution will be significantly increased as to

---

[43] *Id.* ¶ 29(c); *see also* Closic Aff. Ex. 3 § 18(a).

[44] Czerwonka Aff. Ex. D at 2, 3. At oral argument, counsel for the Individual Defendants informed the Court that "a similar confidential information statement went out to the holders of common equity" and that the document "was used in the dispositive motion briefing in Texas." D.I. 46 ("Tr.") at 98. The parties then filed letters on this point, including the referenced confidential information statement. D.I. 45 & 47. Because I conclude Plaintiffs' claims are derivative, I need not consider that statement.

[45] Czerwonka Aff. Ex. D. at 2.

[46] *Id.* at 4. The Confidential Information Statement described Series A-1 Preferred Stock as being available to those "who purchased convertible promissory notes" under a 2009 Note Purchase Agreement. *Id.* at 2, 4. It is unclear whether that 2009 Note Purchase Agreement was the "bridge funding" IDEV raised in 2009.

Preferred Stockholders that do not participate in the Financing."[47] Plaintiffs did not participate in the Financing.

The Financing had one other relevant consequence. When IDEV had offered shares of common stock to its employees in the past, many had financed "their purchases through full recourse promissory notes partially secured by the common stock."[48] The notes amounted to more than $1.7 million at the end of 2009.[49] The Financing caused the value of that common stock to decrease, meaning the notes became "substantially undersecured."[50] In November 2011, IDEV declared and issued special bonuses to employees who had given those promissory notes.[51] IDEV received the employees' shares and cancelled the promissory notes.[52]

### D. After An Acquirer Purchases IDEV, Plaintiffs Sue In Texas, But Are Sent To Delaware Pursuant To A Forum Selection Clause.

In 2013 Abbott Laboratories acquired IDEV "for $310 million net of cash and debt."[53] IDEV's success was bitter for Plaintiffs because the Financing had diluted their previously significant holdings. Sheldon and Konya allege they would have

---

[47] *Id.* at 4.

[48] Compl. ¶ 21.

[49] *Id.*

[50] *Id.* ¶¶ 30(b), 39.

[51] *Id.* ¶¶ 30(b), 39.

[52] *Id.* ¶ 30(b).

[53] *Id.* ¶ 31.

11

made $7.75 million and $3.875 million, respectively, in the Abbott transaction had the Financing never occurred.[54] After the Financing, however, they would "be fortunate to receive $15,000 and $7,500, respectively, for their shares."[55] Plaintiffs sued in Texas to obtain a different outcome.

Plaintiffs' suit in Texas took the parties on a grand tour of the Texas court system. Plaintiffs alleged the Venture Capital Defendants, Individual Defendants, and Owens and Burke committed "fraud, breach of fiduciary duty, minority-shareholder oppression, Texas Blue Sky Law violations, and conspiracy as to [certain] parties."[56] Plaintiffs chose "not to seek a contractual remedy for violation of the preemptive right and of anti-dilution provisions of the shareholder agreements,"[57] which contained a Delaware forum selection clause.[58]

Still, the defendants in Texas invoked the forum selection clause through a motion to dismiss, which the trial court granted. Plaintiffs appealed that decision to the Fourteenth Court of Appeals of Texas. The Court of Appeals reversed, ruling that Plaintiffs' claims did not "arise out of" the Shareholders Agreement.[59]

---

[54] *Id.* ¶ 32.

[55] *Id.*

[56] *Sheldon II*, 526 S.W.3d at 434.

[57] *Id.* at 441.

[58] Closic Aff. Ex. 3 § 24.

[59] *Sheldon I*, 477 S.W.3d at 421.

Defendants appealed to the Supreme Court of Texas. The Supreme Court of Texas agreed with Defendants, ruling they could enforce the forum selection clause against Plaintiffs, even though the claims sounded in tort rather than in contract.[60]

Plaintiffs responded by filing a complaint here. After the Individual Defendants and the Venture Capital Defendants moved to dismiss, Plaintiffs amended and filed their Verified Amended Complaint as allowed by Court of Chancery Rule 15(aaa). Both sets of defendants again moved to dismiss on July 16, 2018. The parties briefed the motions and I heard oral argument on November 1, 2018. For the reasons below, I grant the motions.

## II. ANALYSIS

The Complaint alleges Defendants used the Financing to unlawfully take a large percentage of IDEV's equity at the expense of minority common stockholders.[61] Plaintiffs allege the Venture Capital Defendants acted together as a controlling stockholder group, using their combined share holdings and their domination and control of the IDEV Board to complete the Financing.[62] Plaintiffs claim the Venture Capital Defendants owed fiduciary duties to Plaintiffs and

---

[60] Owens and Burke were defendants in Texas but were not parties to the Shareholders Agreement and so were not bound by the forum selection clause. *Sheldon II*, 526 S.W.3d at 447. Accordingly, Plaintiffs' suit against Owens and Burke remains pending in Texas.

[61] Compl. ¶ 1.

[62] *Id.* ¶ 2.

breached those duties.[63]  Plaintiffs assert a single breach of fiduciary duty count based on these allegations, which also contains brief allegations of disclosure violations by Sheldon individually.

Defendants moved to dismiss on several grounds.  Defendants correctly asserted that Plaintiffs' primary claims are derivative.  Plaintiffs failed to satisfy the requirements of Rule 23.1 by not making a demand on IDEV's Board or pleading that a demand would have been futile.  Their breach of fiduciary claim must be dismissed.  The related aiding and abetting and unjust enrichment claims, as pled, must suffer a similar fate.  Because Defendants' Rule 23.1 arguments dispose of those claims, I do not address their Rule 12(b)(6) arguments.  As to Sheldon's cursory disclosure claim, those allegations fail to state a claim upon which relief can be granted.

### A. Defendants Are Not Judicially Estopped From Arguing Plaintiffs' Claims Are Derivative.

According to Plaintiffs, Defendants are judicially estopped from arguing Plaintiffs' claims are derivative because Defendants prevailed in enforcing the forum selection clause in the Shareholders Agreement.[64]  "Judicial estoppel applies in Delaware when (i) 'a litigant advances a position inconsistent with a position taken

---

[63]  *Id*.

[64]  D.I. 34 at 15-17.

in the same or earlier legal proceeding' and (ii) 'the court was persuaded to accept the previous argument as a basis for its earlier ruling.'"[65] The "persuaded to accept" element is important: "parties raise many issues throughout a lengthy litigation" and "only those arguments that persuade the court can form the basis for judicial estoppel."[66] In this case, the issue is whether Defendants' successful argument that the forum selection clause governed Plaintiffs' claims in Texas means Defendants cannot now assert the claims here are derivative.

A court's application of a forum selection clause or other procedural device does not necessarily estop a party from arguing the claim is direct or derivative. The most helpful precedent appears to be *In re First Interstate Bancorp Consolidated Shareholder Litigation.*[67] There, the plaintiffs argued the defendants could not contest whether the plaintiffs' claims were direct or derivative because the court had entered the parties' stipulation certifying a class.[68] This Court rejected that argument, stating the class certification order merely determined a procedural issue

---

[65] *In re Rural/Metro Corp. S'holders Litig.*, 102 A.3d 205, 246-47 (Del. Ch. 2014) (quoting *VIII–Hotel II P Loan Portfolio Hldgs., LLC v. Zimmerman*, 2013 WL 5785290, at *3 (Del. Super. Ct. Sept. 19, 2013)), *aff'd sub nom.*, *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

[66] *Motorola Inc. v. Amkor Tech., Inc.*, 958 A.2d 852, 859 (Del. 2008).

[67] 729 A.2d 851 (Del. Ch. 1998).

[68] *Id*. at 859.

and was "not a finding by the Court as to the nature of the underlying claims."[69] In the absence of a specific judicial determination that plaintiffs' claims were direct or derivative, defendants could argue the claims were derivative and should be dismissed.[70]

In *Huffington v. T.C. Group, LLC*, the defendants persuaded the District of Massachusetts to enforce a forum selection clause.[71] When the case was filed in Delaware Superior Court, the defendants moved to dismiss the claims as time-barred.[72] The plaintiff argued that by persuading the District of Massachusetts that the plaintiff could sue in Delaware and that Delaware courts could properly apply Massachusetts law, the defendants had implied to the District Court that the claims were not time-barred.[73] The Superior Court rejected plaintiffs' argument, noting "[n]othing in the District Court's opinion addresse[d] the statute of limitations in Delaware," because "the [e]ffect the statute ha[d] on [the plaintiff's] claim in Delaware should have been of no consequence to the District Court's determination

---

[69] *Id.*

[70] *Id.*

[71] 2012 WL 1415930, *2 (Del. Super. Ct. Apr. 18, 2012).

[72] *Id.* at *5.

[73] *Id.*

in this matter. The forum selection clause was either enforceable or not enforceable."[74]

These decisions, and others in different contexts,[75] show that an estoppel analysis requires a careful and literal reading of the arguments and decision in the earlier matter. Any preclusive effect flowing from a court's application of a procedural measure is circumscribed by that court's reasoning and the parties' arguments before it. In this case, the context and explanation for the Supreme Court of Texas's enforcement of the forum selection clause makes clear that court did not decide whether Plaintiffs' claims are direct or derivative.[76]

The direct/derivative issue does not appear at all in the Texas opinion.[77] The Texas Court did not hold that Plaintiffs' claims were contractual, which might

---

[74] *Id.*

[75] *See In re Rural/Metro Corp S'holders Litig.*, 102 A.3d at 247 (plaintiffs could argue defendants were not joint tortfeasors, despite earlier arguing to the contrary, because settlement stipulation with the defendants entered by Court did not contain admission of liability); *Daniels v Opteck Tech., Inc.*, 2013 WL 6913270, at *2 (Del. Super. Ct. Dec. 30, 2013) (court's previous decision on motion for summary judgment "did not depend on" issues implicated by later motion for leave to amend complaint).

[76] In briefing, Plaintiffs provided one filing Defendants submitted in Texas. Czerwonka Aff. Ex. B. Defendants argue I cannot consider the filing, though they also provided filings Plaintiffs submitted in Texas. Closic Aff. Exs. 1 & 2. Even though both sides have submitted Texas filings, I cannot take judicial notice of filings in other courts "for the truth of [their] contents." *In re Rural Metro Corp. S'holders Litig.*, 2013 WL 6634009, at *9 (Del. Ch. Dec. 17, 2013). I consider the decision by the Supreme Court of Texas, which is the basis for Plaintiffs' estoppel argument. Compl. ¶ 34.

[77] At oral argument, Plaintiffs' counsel conceded "the direct/derivative distinction" was not at issue before the Supreme Court of Texas. Tr. at 81-82.

implicate the Delaware decisions Plaintiff cites.[78]  To the contrary, the Supreme

Court of Texas painstakingly made clear that Plaintiffs were asserting claims

sounding in tort, not contract.  Exemplary language includes:

- References to "the statutory and common-law tort claims alleged in this lawsuit"[79] and "the shareholders' extracontractual claims."[80]

- Framing whether Plaintiffs "*noncontractual* claims" fell within the forum selection clause.[81]

- Describing how federal courts determine "whether such a clause extends to *noncontractual* claims."[82]

- "Additionally, we note that many of the *statutory and common-law tort claims* involve the same operative facts that would be implicated in a parallel *breach-of-contract* claim, *had one been pursued*."[83]

- "Notably, the factual allegations giving rise to the *noncontractual* claims are integral to the dispute's resolution."[84]

- "A contract claim or defense implicating these issues would involve the same operative facts as statutory and common-law tort claims addressing the same matters.  Sheldon acknowledges this fact, stating [he] chose, as was his right, not to seek a contractual remedy for violation of the preemptive right and of anti-dilution provisions of the shareholder agreements.  Although Sheldon has

---

[78]  *See* D.I. 34 at 16-17 (citing *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125 (Del. 2016); *NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175 (Del. 2015)).

[79]  *Sheldon II*, 526 S.W.3d at 437.

[80]  *Id*. at 432.

[81]  *Id*. at 437 (emphasis added).

[82]  *Id*. at 438 (emphasis added).

[83]  *Id*. at 441 (emphasis added).

[84]  *Id*. (emphasis added).

that right, he cannot 'evade enforcement of forum selection agreements through artful pleading of tort claims in the context of a contract dispute.'"[85]

- Addressing an alternative argument that even if Plaintiffs "statutory and common-law tort claims" fell under the forum selection clause Konya did not have to litigate in Delaware.[86]

Having decided Plaintiffs were asserting tort claims, rather than contract claims, the Texas Court turned to Defendants' attempt to enforce the forum selection clause and concluded the clause applied. The Texas Court focused on the fact that the forum selection clause encompassed any "dispute arising out of" the Shareholders Agreement.[87] The Texas Court explained the forum selection clause covered any "dispute," rather than any "claim," and therefore was "necessarily broader than claims based solely on rights originating exclusively from the contract."[88] This key distinction meant Plaintiffs' tort claims "ar[ose] out of the [] Shareholders Agreement" and Plaintiffs needed to file in Delaware.

In my view, the Supreme Court of Texas decided whether Plaintiffs' tort claims arose out of the Shareholders Agreement for the limited purpose of whether it should enforce the forum selection clause. The Texas Court concluded Plaintiffs' dispute arose out of the Shareholders Agreement, and did not consider or decide

---

[85] *Id.* (internal quotation marks omitted).

[86] *Id.* at 442.

[87] *Id.* at 437.

[88] *Id.* at 439.

19

whether the claims were direct or derivative. Therefore, because the Supreme Court of Texas did not accept that Plaintiffs' claims were direct, or even contractual, in enforcing the forum selection clause, Defendants are not judicially estopped from claiming Plaintiffs' claims are derivative.

## B. Standard of Review

Plaintiffs argue they have "a direct claim under the well-established rule of *Gentile v. Rossette*."[89] They have not pled or argued that if *Gentile* does not apply, they could still pursue their resulting derivative claims under Rule 23.1's heightened pleading standard.[90] Accordingly, if *Gentile* does not apply, I must dismiss Plaintiffs' claims.

On Defendants' motion to dismiss, I apply the reasonable conceivability standard of Rule 12(b)(6) to evaluate Plaintiffs' allegations that a control group

---

[89] Pls.' Answering Br. 18. Claims under *Gentile* are not purely direct, but have a "dual character" and are "both derivative and direct." *Gentile*, 906 A.2d at 99-100. Because Plaintiffs have focused only on their direct claims, "to the extent any aspect of [their] claims could be considered partially derivative, Plaintiff[s] ha[ve] abandoned or waived such claims." *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *8 n.32 (Del. Ch. June 23, 2015).

[90] *See Cumming v. Edens*, 2018 WL 992877, at *11 (Del. Ch. Feb. 20, 2018) ("Rule 23.1 places a heightened pleading burden on the plaintiff to meet 'stringent requirements of factual particularity that differ substantially from the permissive notice pleadings' embodied in Court of Chancery Rule 8 and that animate Court of Chancery Rule 12(b)(6)." (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000))). The Independent Director Defendants argued in their Opening Brief that the "Plaintiffs also do not allege *any* well-pleaded facts suggesting demand would have been futile." Independent Director Defs.' Opening Br. 23. Plaintiffs remained silent in briefing and at argument on this point.

exists such that their claims are direct.[91]  Under that standard, I must "accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as 'well-pleaded' if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[92]

## C.     Plaintiffs' Claims Are Solely Derivative.

Whether a claim is direct or derivative is governed by *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[93]  My decision "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[94]  "[A] court should look to the nature of the wrong and to whom the relief should go.  The stockholder's claimed direct injury must be independent of any alleged injury to the corporation."[95]  "The stockholder must demonstrate that the duty breached was owed to the stockholder

---

[91] *See Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) (applying the reasonable conceivability standard in determining whether controlling stockholder existed for *Gentile* analysis).

[92] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[93] 845 A.2d 1031 (Del. 2004).

[94] *Id*. at 1033.

[95] *Id*. at 1039.

and that he or she can prevail without showing an injury to the corporation."[96]

Dilution claims, like the ones Plaintiffs advance here, are classically derivative.[97]

Plaintiffs do not argue that a *Tooley* analysis leads to a different conclusion here.

Instead, Plaintiffs argue their breach of fiduciary duty claim is direct under *Gentile*

*v. Rossette*.[98]  Dilution claims are treated as "both derivative and direct" if:

> (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders.[99]

Plaintiffs assert the Venture Capital Defendants constituted a control group.[100]

A group of stockholders "can collectively form a control group where those

shareholders are connected in some legally significant way—e.g., by contract,

common ownership, agreement, or other arrangement—to work together toward a

---

[96]  *Id.*

[97]  *See Green v. LocatePlus Hldgs., Corp.*, 2009 WL 1478553, at *2 (Del. Ch. May 15, 2009) ("Classically, Delaware law has viewed as derivative claims by shareholders alleging that they have been wrongly diluted by a corporation's overpayment of shares."); *see also El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1251 (Del. 2016) (noting the "traditional rule that dilution claims are classically derivative").

[98]  Pls.' Answering Br. 18-22.

[99]  *Gentile*, 906 A.2d at 100.

[100]  *See In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014) ("Under Delaware law, in appropriate circumstances, multiple stockholders together can constitute a control group, with each of its members being subject to the fiduciary duties of a controller.").

shared goal."[101] But because "even a majority stockholder is entitled to vote its shares as it chooses, including to further its own interest,"[102] Plaintiffs "must allege more than mere concurrence of self-interest among certain stockholders to state a claim based on the existence of a control group."[103]

Plaintiffs allege the Venture Capital Defendants (i) "collectively controlled over 60% of the Company's issued and outstanding shares";[104] (ii) were parties to a voting agreement that gave them the right to appoint three directors to the IDEV Board,[105] with those directors choosing two additional directors; (iii) "had a long and close relationship of investing together for their mutual benefit";[106] and (iv) acted in concert to complete the Financing to "extract economic benefit for their own selfish gain while unfairly diluting the economic and voting interests of Plaintiffs."[107] Plaintiffs analogize these facts to those supporting a control group in *In re Hansen Medical, Inc. Stockholders Litigation*.[108]

---

[101] *Dubroff v. Wren Hldgs., LLC*, 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009).

[102] *Emerson Radio Corp. v. Int'l Jensen Inc.*, 1996 WL 483086, at *17 (Del. Ch. Aug. 20, 1996).

[103] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15.

[104] Compl. ¶ 23.

[105] *Id.* ¶ 24.

[106] *Id.* ¶ 25.

[107] *Id.* ¶ 26.

[108] 2018 WL 3030808, at *3 (Del. Ch. June 18, 2018).

Plaintiffs' allegations fall short of those in *Hansen*, and are more akin to those in *van der Fluit v. Yates*, in which this Court found the complaint failed to adequately allege a control group.[109] The control group in *Hansen*, which consisted of two individuals and their affiliated entities, had worked together for more than twenty years, going back to an investment in which they had "entered into a voting agreement and declared themselves to the SEC as a 'group' of stockholders."[110] In the two decades after that pronouncement, those investors "coordinate[d] their investment strategy in at least seven different companies."[111] When they invested in the acquired company in *Hansen*, the investors "were the only participants in a private placement that made them the largest stockholders."[112]

In the squeeze-out merger at issue in *Hansen*, the purchaser identified the investors as "Key Stockholders" and "entered into agreements that allowed [them, and only them,] to negotiate directly with" the acquirer.[113] The agreements also obligated the investors to vote for the merger.[114] And finally, the investors could

---

[109]  2017 WL 5953514, at *6 (Del. Ch. Nov. 30, 2017).

[110]  *In re Hansen Med., Inc.*, 2018 WL 3030808, at *3.

[111]  *Id.*

[112]  *Id.* at *7.

[113]  *Id.*

[114]  *Id.*

24

roll their shares over into stock of the acquirer, while the minority stockholders received only cash.[115] The Court concluded that

> [a]lthough each of these factors alone, or perhaps even less than all these factors together, would be insufficient to allege a control group existed, all of these factors, when viewed together in light of the [defendants'] twenty-one year coordinated investing history, ma[d]e it reasonably conceivable that [they] functioned as a control group during the Merger.[116]

The Venture Capital Defendants in this case were not as intertwined, collaborative, or exclusive as the members of the *Hansen* control group. Plaintiffs allege that subsets of the Venture Capital Defendants have invested in four other companies.[117] But they have not alleged that all of the Venture Capital Defendants have invested together in any other company, that they coordinated their investments, or that they have declared themselves as a group of investors to the SEC or any other authority. Plaintiffs' allegations merely indicate that venture capital firms in the same sector crossed paths in a few investments. That is different from the "long history of cooperation and coordination" in *Hansen*.[118]

The Venture Capital Defendants were not the only participants in the pre-Financing Series A, B, or C rounds, or the Series B-1 involved in the Financing.

---

[115] *Id*. at *4, *7, *9.

[116] *Id*. at *7.

[117] Compl. ¶ 25.

[118] *In re Hansen Med., Inc.*, 2018 WL 3030808, at *7.

25

Other investors participated in those rounds and received the same securities, but are not alleged to be part of the control group.[119] For example, Covidien Group S.A.R.L. did not own IDEV stock before the Financing, but invested more in the Financing than RiverVest.[120] These facts distinguish *Hansen*, in which the members of the control group gained majority voting control through an exclusive private placement that involved no outside investor.[121]

In further distinction from *Hansen*, the Venture Capital Defendants in this case were not contractually bound to pursue the Financing. Plaintiffs make much of the voting agreement in the Shareholders Agreement. That provision did ensure PTV, RiverVest, and Bay City could each appoint one director to the Board.[122] But its details undercut Plaintiffs' claims. First, the voting agreement only governed selecting directors for IDEV's Board. Each Shareholder otherwise "retain[ed] at all times the right to vote [their] Restricted Shares in [their] sole discretion on all matters presented to the Corporation's Shareholders for a vote."[123]

---

[119] Closic Aff. Ex. 3 Schedules 1 & 2 (lists of Key and Significant Shareholders showing owners of Series A, B, and C Preferred Shares); Czerwonka Aff. Ex. A, Ex. A (schedule of purchasers in Financing).

[120] Czerwonka Aff. Ex. A, Ex. A (schedule of purchasers in Financing); Tr. at 14, 30, 32-33.

[121] 2018 WL 3030808, at *7.

[122] Closic Aff. Ex. 3 § 7(a)(i)-(iii).

[123] *Id*. § 7(c).

Second, all of the Key and Significant Shareholders identified in the Shareholders Agreement agreed to vote for the Venture Capital Defendants' nominees. These groups total more than seventy stockholders, including Plaintiffs.[124] As in *van der Fluit*, Plaintiffs offer "no explanation for why [the Venture Capital Defendants] are members of an alleged control group while the numerous other signatories to these agreements are not."[125]

*Hansen*, citing *van der Fluit*, noted that where agreements with "no relation to the actual transaction" were "entered into by the entirety of the stockholders instead of just the control group," those agreements do not create a control group.[126] The Shareholders Agreement bound not only the Venture Capital Defendants, but all Shareholders, and it did not bear on the Financing or bind the Venture Capital Defendants beyond selecting directors. The Shareholders Agreement does not compel a finding that the Venture Capital Defendants were a control group.[127]

---

[124] Closic Aff. Ex. 3 Schedules 1 & 2 (lists of Key and Significant Shareholders showing owners of Series A, B, and C Preferred Shares). Plaintiffs also claim that the Venture Capital Defendants enjoyed "greater rights and protections" because they were "Significant Shareholders." Pls.' Answering Br. 26. Because there were seventy Significant Shareholders, and Sheldon was himself a Significant Shareholder, that status did not carry the clout Plaintiffs contend it does.

[125] 2017 WL 5953514, at *6.

[126] *In re Hansen Med., Inc.*, 2018 WL 3030808, at *6 n.79.

[127] *See van der Fluit*, 2017 WL 5953514, at *6 ("The Investor Rights Agreement to which [the stockholders] are signatories contains no voting, decision-making, or other agreements that bear on the transaction challenged in the instant case."); *In re Crimson Expl. Inc.*

I conclude this case more closely resembles *van der Fluit* than *Hansen*, and therefore find Plaintiffs have failed to allege the Venture Capital Defendants functioned as a control group. In *van der Fluit*, the supposed members of the control group were (a) two of the company's founders, who were directors and owned about 30% of the company's stock, (b) a venture capital investor who owned 16.8% of the company's stock and appointed a member to the company's board, and (c) another venture capital investor who owned about 3% of the company's stock.[128] The alleged control group thus owned just under 50% of the company's stock as of the time of the merger.[129] As in this case, the alleged controllers held three of the seven board seats.[130] This Court rejected the idea that those individuals and investors were

---

S'holder Litig., 2014 WL 5449419, at *15 (noting plaintiff did "not plead that [the party] signed any voting agreement regarding the Merger" at issue).

[128] 2017 WL 5953514, at *6; *see also van der Fluit*, C.A. 12553-VCMR, D.I 28, Ex. D at 23 (Schedule 14A).

[129] The combined ownership here is alleged to be over 60%, but that threshold is not dispositive without indicia of coordination. *See Zimmerman v. Crothall*, 62 A.3d 676, 700 (Del. Ch. 2013) (stating two large stockholders who together owned 66% of the company's voting shares and appointed two of the board's five directors were not controlling stockholders because there was "no showing that they acted as one unit or that one exerted control over the other"); *Dubroff*, 2009 WL 1478697, at *4 (granting motion to dismiss and ruling entities that owned 56% of voting stock and controlled four of the five directors were not a control group because they were not "tied together in some legally significant way"); *Feldman v. Cutaia*, 956 A.2d 644, 657-58 (Del. Ch. 2007) (finding no control group when complaint only alleged that the board members and their families controlled 60% of the company's equity but alleged no agreement between them), *aff'd*, 951 A.2d 727 (Del. 2008).

[130] 2017 WL 5953514, at *11.

members of a control group, noting the entities "simply appear[ed] to be early venture capital investors selected by Plaintiff as an attempt to increase the stock ownership of the purported group."[131] Those entities' participation in an investor rights agreement, which gave "registration and informational rights to early stage investors," did not compel a finding that they were a control group because it contained no voting or decision-making agreement "that [related to] the transaction challenged in the instant case."[132] The same is true here for the Venture Capital Defendants as bound by the Shareholders Agreement, which in no way related to the Financing.

Plaintiffs seek a charitable reading of their allegations based on *Hansen*'s explanation that determining "whether a control group exists is fact intensive" and "particularly difficult to ascertain at the motion to dismiss stage."[133] But *van der Fluit* makes clear the Court can decide the issue at the motion to dismiss stage, and a plaintiff must still plead facts that make the conclusion reasonably conceivable.[134] Plaintiffs have not done so.

---

[131] *Id.* at *6.

[132] *Id.* at *6.

[133] Pls.' Answering Br. 24-25 (quoting *In re Hansen Med., Inc.*, 2018 WL 3030808, at *6).

[134] *van der Fluit*, 2017 WL 5953514, at *7; *see also In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 ("Plaintiffs must allege more than mere concurrence of self-interest among certain stockholders to state a claim based on the existence of a control group."); *id.* at *15 (refusing to "pile up [the] questionable inferences" plaintiffs requested "until such a conclusion is reached").

### 1. Recent Authority Suggests *Gentile* Does Not Apply In Situations Without A Controlling Stockholder.

Plaintiffs also argue they need not plead the existence of a controlling stockholder to assert a *Gentile* claim. Plaintiffs cite *Carsanaro v. Bloodhound Technologies, Inc.*,[135] and *In re Nine Systems Corp. Shareholders Litigation*[136] to argue *Gentile* permits stockholders to pursue claims where "the board effectuating the transaction lacks a disinterested and independent majority."[137] Plaintiffs' argument suffers from two problems: one doctrinal, the other factual.

As to doctrine, *Carsanaro* and *Nine Systems* do support Plaintiffs' argument. But our Supreme Court's ruling in *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*[138] and later decisions by this Court have cast doubt on whether *Carsanaro* and *Nine Systems* are good law on this point. In *El Paso* the Supreme Court "decline[d] the invitation to further expand the universe of claims that can asserted" dually.[139] Recently, Vice Chancellor Glasscock stated that "*El Paso* thus implicitly rejected the reasoning of decisions such as *Carsanaro* and *Nine Systems*, which had extended

---

[135] 65 A.3d 618 (Del. Ch. 2013).

[136] 2014 WL 4383127 (Del. Ch. Sept. 4, 2014).

[137] Pls.' Answering Br. 20.

[138] 152 A.3d 1248 (Del. 2016).

[139] *Id*. at 1264.

30

*Gentile* to any dilutive issuance approved by a conflicted board."[140]  I too decline to extend *Gentile* as *Carsanaro* and *Nine Systems* did.

Even if I were to apply *Nine Systems* and *Carsanaro* to the facts here, dismissal would still be warranted.  To succeed on this theory, Plaintiffs must plead that a majority of IDEV's Board was not disinterested and independent.[141]  They must do so in their complaint, not their answering brief, because "it is impermissible to attempt to amend one's pleading through a brief."[142]

Plaintiffs' Complaint fails to plead the Board lacked a disinterested and independent majority.  Plaintiffs do not identify four of the Board members by name in the Complaint.[143]  The Complaint does not allege whether or how the Venture

---

[140]  *Sciabacucchi v. Liberty Broadband Corp.*, 2018 WL 3599997, at *10 (Del. Ch. July 26, 2018); *see also Klein v. H.I.G. Capital, L.L.C.*, 2018 WL 6719717, at *7 (Del. Ch. Dec. 19, 2018) (noting "this court has exercised caution in applying the *Gentile* framework"); *Cirillo Family Tr. v. Moezinia*, 2018 WL 3388398, at *16 (Del. Ch. July 11, 2018) ("the *Gentile* paradigm only applies when a stockholder *already possessing majority or effective control* causes the corporation to issue more shares to it for inadequate consideration"); *Carr*, 2018 WL 1472336, at *9 ("to invoke the dual dynamic recognized in *Gentile*, a controlling stockholder must exist *before* the challenged transaction"); *see also Almond for Almond Family 2001 Tr. v. Glenhill Advisors LLC*, 2018 WL 3954733, at *24 (Del. Ch. Aug. 17, 2018) (noting the Supreme Court in *El Paso* "recently construed the [*Gentile*] doctrine narrowly" and that "[i]n the wake of *El Paso*, this court has exercised caution in applying the *Gentile* framework").

[141]  *Carsanaro,* 65 A.3d at 658.

[142]  *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *25 (Del. Ch. Dec. 19, 2017).

[143]  Plaintiffs allege the board consisted of six directors in their Complaint, but in their Answering Brief state there were seven directors.  *Compare* Compl. ¶ 24 *with* Pls.' Answering Br. 7-8.  Defendants seem to agree there are seven directors, and so I assume there are seven.

31

Capital Defendants control those unnamed individuals. The only allegation of control is that the Venture Capital Defendants chose three directors, who then, by a majority vote, selected two additional directors.[144]

From this, and nothing else, Plaintiffs request "a pleadings-stage inference of disloyalty."[145] This request conflicts with "well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder."[146] Plaintiffs have not pled that it is reasonably conceivable that a majority of the board was not disinterested or independent, and so cannot benefit from an inference of disloyalty. Even if *Gentile* extended to claims in the context of a board lacking a disinterested and independent majority, the Complaint does not plead the facts necessary to survive dismissal.

### 2. Plaintiffs Cannot Pursue Their Derivative Breach Of Fiduciary Duty Claim.

"The consequences of classif[ying] [] a claim as either direct or derivative can be outcome determinative."[147] This distinction is particularly consequential "here because [Plaintiffs] did not make a demand upon the Board to bring the claim

---

[144] Compl. ¶ 24.

[145] Pls.' Answering Br. 34.

[146] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014), *aff'd sub nom.*, *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304 (Del. 2015).

[147] *Rhodes v. Silkroad Equity, LLC*, 2007 WL 2058736, at *4 (Del. Ch. July 11, 2007).

and ha[ve] made no effort in [their] Complaint to plead that demand would have been futile."[148]  Plaintiffs' derivative claims must be dismissed for two reasons.

First, because Plaintiffs' claims are derivative, their "Complaint must comply with Court of Chancery Rule 23.1."[149]  Plaintiffs do not argue they satisfied Rule 23.1's requirements.  Rule 23.1(a) requires Plaintiffs to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[150]  Plaintiffs did not make a demand on IDEV's Board, and do not argue they are excused from doing so.

Second, the continuous ownership rule requires that "a derivative shareholder must not only be a stockholder at the time of the alleged wrong and at [the] time of commencement of suit but that he must also maintain shareholder status throughout the litigation."[151]  "It is well established under our Supreme Court's decision in *Lewis v. Anderson* and its progeny that, as a general matter, a merger extinguishes a

---

[148] *Akrout v. Jarkoy*, 2018 WL 3361401, at \*7 (Del. Ch. July 10, 2018).

[149] *Sciabacucchi*, 2018 WL 3599997, at \*10.

[150] Ct. Ch. R. 23.1(a).

[151] *Lewis v. Anderson*, 477 A.2d 1040, 1046 (Del. 1984); *see also* 8 *Del. C.* § 327 ("In any derivative suit instituted by a stockholder of a corporation, it shall be averred in the complaint that the plaintiff was a stockholder of the corporation at the time of the transaction of which such stockholder complains or that such stockholder's stock thereafter devolved upon such stockholder by operation of law.").

plaintiff's standing to maintain a derivative suit."[152]    There are two limited exceptions to this rule,[153] but Plaintiffs do not claim either applies.  When Abbott acquired IDEV for cash, Plaintiffs lost standing to assert derivative claims on IDEV's behalf.

Plaintiffs' derivative claim for breach of fiduciary duty must be dismissed.

### D.    Plaintiffs' Aiding and Abetting and Unjust Enrichment Claims Fall With Their Fiduciary Duty Claim.

Plaintiffs alternatively plead that even if the Venture Capital Defendants did not owe fiduciary duties, they aided and abetted IDEV's directors in breaching their fiduciary duties.[154]  The elements of an aiding and abetting a breach of fiduciary duty claim are "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach."[155]  "Prior decisions of this court have validated the unsurprising proposition that an aiding and abetting claim premised on a

---

[152] *Almond*, 2018 WL 3954733, at *23; *see also Lewis v. Ward*, 852 A.2d 896, 899 (Del. 2004) ("The effect of a merger, such as the one that took place in this case, is normally to deprive a shareholder of the merged corporation of standing to maintain a derivative action.").

[153] *See Lewis*, 852 A.2d at 899 ("That general rule is, however, subject to two limited exceptions:  (1) Where the merger itself is the subject of a claim of fraud, being perpetrated merely to deprive shareholders of the standing to bring a derivative action; and (2) Where the merger is in reality a reorganization which does not affect plaintiff's ownership of the business enterprise.").

[154] Compl. ¶ 43.

[155] *RBC Capital Markets, LLC*, 129 A.3d at 861.

derivative cause of action is necessarily derivative itself."[156]  Plaintiffs' aiding and abetting claim thus fails for the same reasons as its fiduciary duty claim.

Plaintiffs' unjust enrichment claim also fails.  "To state a claim, the complaint must allege sufficient facts plausibly to show:  (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[157]

Plaintiffs' unjust enrichment claim alleges the same "severe and unlawful dilution of Plaintiffs' shares of IDEV stock" at the heart of their fiduciary duty claim.[158]  I therefore reach the same conclusion as I did for the breach of fiduciary duty claim:  Plaintiffs' unjust enrichment claim is derivative under *Tooley*.[159]  It must also be dismissed.

---

[156] *Feldman*, 956 A.2d at 662; *see also In re Alloy, Inc.*, 2011 WL 4863716, at *14 (Del. Ch. Oct. 13, 2011) ("As a matter of law and logic, there cannot be secondary liability for aiding and abetting an alleged harm in the absence of primary liability.").

[157] *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *16 (Del. Ch. Dec. 22, 2010).  Plaintiffs cited only Delaware law in support of their unjust enrichment claim and I therefore assume Delaware law governs this claim.

[158] Compl. ¶ 48.

[159] *See Reiter v. Fairbank*, 2016 WL 6081823, at *14 (Del. Ch. Oct. 18, 2016) (dismissing derivative breach of fiduciary duty and unjust enrichment claims under Rule 23.1); *Metro. Life Ins. Co. v. Tremont Grp. Hldgs., Inc.*, 2012 WL 6632681, at *9 (Del. Ch. Dec. 20, 2012) (classifying unjust enrichment claim as derivative and dismissing along with breach of fiduciary duty claim); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *23-24 (Del. Ch. May 5, 2010) (ruling unjust enrichment claim was derivative and dismissing for failure to make demand).

## E. Sheldon's Disclosure Claims Also Fail.

In the same count as Plaintiffs' derivative breach of fiduciary duty claim, Sheldon alleges Defendants breached their fiduciary duties by failing to disclose material facts related to the Financing.[160] "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[161] "Framed differently, an omitted fact is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"[162]

---

[160] This claim is brought only by Sheldon. Compl. ¶ 39. The parties' briefing left two aspects of this claim unclear. The first is whether the claim is direct or derivative, or if the relief requested is proper for a disclosure claim. *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006). I assume the claim is direct and do not reach the relief issue. Second, the "scope and requirements [of a fiduciary's obligation to disclose information] depend on context." *In re Wayport, Inc. Litig.*, 76 A.3d 296, 314 (Del. Ch. 2013); *compare* Independent Director Defs.' Opening Br. 36-37 (discussing disclosures as part of a request for stockholder action) *with* Stockholder Defs.' Opening Br. 21-22 (arguing defendants had no fiduciary duties in providing information). At argument, Sheldon's counsel focused on whether the information statement contained "sufficient disclosures" to allow Sheldon "to actually make an informed decision as to whether to participate." Tr. at 86-87; *see also* Tr. 66-67 (referencing disclosure statement). I apply the standard for disclosing information to stockholders as part of a request for stockholder action. I analyze this claim only against the Individual Defendants because of my conclusion that the Venture Capital Defendants were not controlling stockholders who owed fiduciary duties.

[161] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[162] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018) (quoting *Rosenblatt*, 493 A.2d at 944).

36

Sheldon's first disclosure claim relates to a release of claims in the Series B-1 Preferred Stock Purchase Agreement. Sheldon complains the disclosure did not "explain exactly why the[] [released] person should be released or exactly what claims were being released."[163] But "'asking why' does not state a meritorious disclosure claim."[164] And as to the scope of the release, the document stated a participant

> hereby waives and releases and promises never to assert any claim or cause of action or liabilities of any nature whatsoever, whether or not now known, that he, she or it has or might have against the Company or any of its predecessors, successors, subsidiaries, parents, affiliates or related entities, or their officers, directors, employees, stockholders, consultants, agents, attorneys or assigns (collectively, the "Released Parties"), with respect to any matter arising out of facts, circumstances or actions occurring in connection with the sale of shares of Series B-1 Preferred Stock, including, without limitation, the conversion of preexisting Preferred Stock into Common Stock, the subsequent reverse stock split as set forth in the Certificate (as defined below), the issuance of the Shares, and the exchange of Common Stock for shares of Series A-1 or Series A-2 Preferred Stock pursuant to the Exchange Agreement.[165]

This provision is very broad. Companies need not disclose every potential or hypothetical application or outcome.[166] More information on the breadth of the

---

[163] Compl. ¶ 30(a).

[164] *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d at 1001.

[165] Czerwonka Aff. Ex. A § 1.8.

[166] *See In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1074 (Del. Ch. 2001) (companies "need not include information that is prospective or hypothetical in nature"); *see also IRA Tr. FBO Bobbie Ahmed v. Crane*, 2017 WL 7053964, at *17 (Del. Ch. Dec. 11, 2017) (dismissing claim that hypothetical scenario had to be disclosed).

release would not have "significantly altered the 'total mix' of information" available to stockholders.[167]

Sheldon's second disclosure claim also fails. By 2010, IDEV had given employees stock in exchange for $1.7 million of promissory notes.[168] The stock served as security for the notes.[169] The Financing diluted the value of those shares, and with them the collateral supporting the notes IDEV held.[170] Sheldon complains that one of the disclosure schedules to the Series B-1 Preferred Stock Purchase Agreement improperly listed the full face value of the notes.

I conclude the Individual Defendants did not need to spell out that the collateral underlying the notes would be affected in the same manner as other stock. The reverse stock split converted every 100 shares of common stock into 1 share of common stock. The Confidential Information Statement stated the Financing would dilute the common stockholders.[171] Because IDEV disclosed "the relevant facts . . . and their effects were obvious,"[172] Sheldon fails to state a claim for relief.[173]

---

[167] *Morrison*, 191 A.3d at 283 (quoting *Rosenblatt*, 493 A.2d at 944).

[168] Czerwonka Aff. Ex. E, § 2.11; Compl. ¶ 21.

[169] Compl. ¶ 21.

[170] *Id*.

[171] Czerwonka Aff. Ex. D. at 4 & Schedule 2.

[172] *Solomon v. Armstrong*, 747 A.2d 1098, 1131 (Del. Ch. 1999), *aff'd,* 746 A.2d 277 (Del. 2000).

[173] *See Crane*, 2017 WL 7053964, at *18 ("Although the eventual loss of voting control would occur only after a very large amount of equity issuances, that fact should have been

Sheldon also complains that "[i]n connection with the" Financing, IDEV did not disclose that "at the time of [the Financing] Defendants had determined to grant special bonuses to employees to eliminate their note obligations."[174] Sheldon has explained no connection between the decision to invest in the Financing and IDEV's decision about compensating its employees who were affected by the Financing.[175] Sheldon has failed to demonstrate why a stockholder would consider IDEV's handling of the employee notes and bonuses important in deciding whether to participate in the Financing.

Further, the bonuses "were declared in November 2011,"[176] sixteen months after the Financing. Sheldon provides no support for his bare allegation that IDEV had decided to make the grants by the time of the Financing.[177] Nor has Sheldon explained why IDEV waited sixteen months to implement the supposed plan. In light of this timing, it is difficult to accept Sheldon's allegation that the Individual

intuitively obvious given that the new Class C shares would have *only 1/100 of a vote per share*."); *In re Family Dollar Stores, Inc. S'holder Litig.*, 2014 WL 7246436, at *20 (Del. Ch. Dec. 19, 2014) ("Because it is obvious that Family did not have the pricing information of General—its competitor, after all—a disclosure to that effect would not significantly alter the total mix of information available in the Proxy.").

[174] Compl. ¶¶ 30, 39.

[175] Approximately 100 employees owned the shares, many in amounts as small as $336. Czerwonka Aff. Ex. E. Schedule 2.11.

[176] Compl. ¶ 30(b).

[177] The court need not accept "conclusory allegations that lack factual support." *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *12 (Del. Ch. Mar. 28, 2018).

Defendants conceived of the bonuses as part of the Financing, and yet did not disclose that information at the time of the Financing. Sheldon has not adequately pled that anyone had made any decision about the bonuses or notes that could be disclosed to stockholders at the time of the Financing. I conclude Sheldon failed to allege a material omission.

## III. CONCLUSION

For these reasons, Defendants' motions to dismiss the Complaint are GRANTED. The Complaint is dismissed with prejudice.

**IT IS SO ORDERED.**